Commonwealth, Appellant, *v.* Columbia Gas
and Electric Corporation.

Argued June 19, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Claude T. Reno,* Attorney General, and *Frank A. Sinon,* Deputy Attorney General, for appellant.

*Geo. Ross Hull,* with him *Wm. A. Seifert, J. Smith Christy, Roy J. Keefer, Chas. W. Hull, Snyder, Hull, Leiby & Metzger, Reed, Smith, Shaw & McClay* and *Weil, Christy & Weil,* for appellee.

*Leighton P. Stradley, Jr.* and *David H. Rosenbluth,* amici curiæ.

OPINION BY MR. CHIEF JUSTICE KEPHART, September 25, 1939:

On October 2, 1933, the Columbia Gas and Electric Company, a Delaware corporation, with its principal office in New York, applied for and obtained a certificate of authority to transact in Pennsylvania the business of "production of oil, gas and electricity and holding of real estate." From that date until October 31, 1935, it owned and operated in this State plants for the manufacture of gasoline and natural gas. In the conduct of that business for the year 1935 it employed tangible property of a book value of $331,813.39, paid wages of $14,926.27 and received from sales $31,451.47, all within or assignable to the State.

The company's corporate powers and businesses were broader than those which it qualified to pursue in Penn-

sylvania. The great bulk of its activities consisted in acting as a holding company. It owned 50% to 100% of the stock of some 50 subsidiaries, a substantial investment in stocks, bonds, mortgages and notes of other companies, and had a large amount of accounts receivable and cash. In 1935 the total value of these intangible assets amounted to approximately $446,000,000. The court below found that the legal situs of this intangible property was outside of this State.

Upon the withdrawal of the company from this State at the end of October, 1935, it filed a franchise tax report for 10 months, setting forth the following information:

Appraised value of entire capital stock .$188,862,501.00

| | |
|---|---|
| Tangible property in Pennsylvania ..... | 331,813.00 |
| Total tangible property .............. | 475,328.00 |
| Wages paid in Pennsylvania .......... | 14,926.00 |
| Total wages paid .................... | 453,612.00 |
| Gross receipts assignable to Pennsylvania | 31,451.00 |
| Total gross receipts .................. | 18,257,245.00 |

The Commonwealth, pursuant to the amendatory Act of May 16, 1935, P. L. 184, settled the tax as follows:

Value of capital stock as appraised by
Department of Revenue ............$188,862,501.00

$$\frac{\$331,813.39}{\$475,328.86} \times \tfrac{1}{3} \text{ of } \$188,862,501 = \qquad 43,946,491.00$$

$$\frac{\$14,926.27}{\$453,612.37} \times \tfrac{1}{3} \text{ of } \$188,862,501 = \qquad 2,071,528.00$$

$$\frac{\$31,451.47}{\$18,257,245.78} \times \tfrac{1}{3} \text{ of } \$188,862,501 = \qquad 108,450.00$$

| | |
|---|---|
| Taxable value of Capital Stock ........ | 46,126,469.00 |
| Tax of Five Mills .................... | 192,193.63 |
| Penalty ............................. | .......... |
| Amount due Commonwealth .......... | 192,193.63 |

An appeal was taken to the court below from this settlement of tax by the Revenue Department.

The taxing officials, from the argument presented in this Court, evidently based the settlement upon the assumption that the company was doing a holding company business in this State because of the following facts: The company had under lease several floors of the Union Trust Company Building in Pittsburgh at a rental of $80,000 per year, which, in turn, was billed proportionately to the operating subsidiaries in Pennsylvania. The company had on deposit in the Union Trust Company from $1,300,000 to $1,400,000. From this account loans were made to its subsidiaries and repaid by them into it; into the account were received dividends of upwards of $658,000, and approximately $522,000, representing the proceeds of gas sold by appellee to another company.

However, the court below found that the executive business of the company was transacted, and all meetings of the stockholders and directors were held, out of the State; the stock certificates of subsidiaries, bonds, mortgages and other evidence of indebtedness were kept, and interest and dividends were received, outside of this State, except those sent for deposit to Pittsburgh, which were immediately entered upon the books of the New York City office. It concluded from this, as well as other evidence, that the company did not conduct a holding company business in this State. It then found that the amendment imposed a franchise tax on foreign corporations; that such tax measured by the capital stock was subject to constitutional restrictions imposed by the due process, equal protection and interstate commerce clauses of the Federal Constitution; that the allocation of taxable value to this State must bear a fair relation to the amount of local business done here by the foreign corporation; that, in this instance, the apportionment formula resulted in allocating a too large taxable value to Pennsylvania, principally because of the

large amount of intangible properties which were located in another State and used solely in the performance of the holding company functions. The court concluded that the formula and allocation fractions prescribed by the statute to ascertain the taxable value of the franchise, operated not only unreasonably in the case of the Columbia Gas and Electric Company but were ". . . inherent in the method of allocation, and arbitrarily and unreasonably affect every corporation which has a substantial part of its intangible property outside of the State, because under the system prescribed by the Act intangible property is brought proportionately into the State for a base upon which to apply the tax." It therefore declared the Act unconstitutional generally. From this decision the Commonwealth has appealed.

Prior to 1935 both domestic and foreign corporations were subject to the capital stock tax imposed by the Act of June 1, 1889, P. L. 420, as amended April 25, 1929, P. L. 657. Domestic corporations paid a tax of 5 mills on the whole amount of their capital stock less certain exemptions. Foreign corporations paid a tax at the same rate on that proportion of the value of their entire capital stock which the tangible assets within the State bore to all assets of the company.

The amendatory Act of May 16, 1935, P. L. 184, is entitled: "An Act to Further Amend . . . by substituting a franchise tax on foreign corporations in lieu of the capital stock tax on such corporations." Section 21B of the Act provides: "Every foreign corporation . . . shall be subject to and pay . . . a franchise tax at the rate of 5 mills upon a taxable value to be determined in the following manner: The actual value of its whole capital stock of all kinds, including common, special and preferred shall be ascertained in the manner prescribed in the 20th Section of this Act and shall then be divided into three equal parts." To each one-third of the value of this entire capital stock there are applied certain fractions, representative of the

fundamental elements of corporate structure, that there may be determined the taxable value allocable to this State to which the tax rate is to be applied. In the first fraction the numerator is the value of tangible property within the State and the denominator is the value of the entire tangible property wherever situated. In the second fraction the numerator is the gross expenditure for wages, salaries, commissions, et cetera paid in this State and the denominator the wages, et cetera, of all employees everywhere. In the third fraction the numerator is the gross receipts from business assignable to the State and the denominator is the total gross receipts from all business. As above noted, each fraction is applied against one-third of the value of the capital stock. Their sum total represents the taxable value.

Prior to the Act of 1935 the tax imposed on capital stock of foreign corporations, as well as domestic, had been repeatedly held to be a property tax.[1] Guided by what was stated in *Commonwealth v. Standard Oil Company,* 101 Pa. 119, and *Commonwealth v. Curtis Publishing Company,* 237 Pa. 333, it became the practice to tax only so much of the capital stock of a foreign corporation as the ratio of tangible assets in the State bore to all assets of the foreign corporation wherever situated. Under this arrangement foreign corporations, transacting a large part of their business here, escaped their fair share of the tax burden. The assets of foreign corporations, so far as they were comprised of intangibles, were wholly free of tax notwithstanding that they may have played an important part in the conduct of the company's local business. The old tax did not even reach all the tangible property of the enterprise located in this State. It made no attempt to value foreign corporations either as going concerns

---

[1] See *Com. v. Standard Oil Co.,* 101 Pa. 119; *Com. v. New York, Penna. and Ohio R. R. Co.,* 188 Pa. 169; *Dupuy v. Johns,* 261 Pa. 40; *Callery's Appeal,* 272 Pa. 255.

within this State, or as parts of going concerns which the foreign corporations had created through operations in this and other states. The discrimination under the old tax law was not only unfair, but operated unjustly in favor of foreign corporations and against domestic corporations, even though they might be similarly situated. It is the old tax which appellee seeks to reëstablish notwithstanding the fact that the capital stock tax imposed on domestic corporations both before and after 1935 taxes their intangibles, subject to certain exemptions.[2]

The legislature sought to remedy this condition by amending the law so that foreign corporations would pay substantially the same amount of tax as domestic corporations though the amount of the tax was arrived at by a different method. The new tax is more in keeping with the benefits received from this State. The tax base represents the value of their right to do business in this State.[3]

The discrimination which had existed in the tax treatment of foreign and domestic corporations might have been remedied by other methods, but it is not for the courts to determine the wisdom of the means chosen to accomplish a given equitable result. The legislature is the sole body to determine that question. It

[2] See the Act of June 22, 1931, P. L. 687; *Com. v. Eastern Securities Co.*, 309 Pa. 44; *Com. v. Penna. R. R. Co.*, 297 Pa. 308; *Com. v. Shenango Furnace Co.*, 268 Pa. 283.

[3] This court stated in *Arrott's Est.*, 322 Pa. 367, 372: "The reason for the change in the method of computation is clear. . . . The old method of measuring the capital stock of foreign corporations doing business in this Commonwealth was unsatisfactory and produced an unfair result. To reach a more equitable measurement of the base for these corporations, . . . the Legislature concluded that a different standard was necessary. This finds expression in the formula contained in the Franchise Tax Act which takes into consideration the ratio of tangible assets in use in this state to all other tangible assets, together with other factors such as payroll and gross receipts."

is only left to us to decide whether the system violates fundamental law.[4]  Judge HARGEST, of the court below, stated: "It [the franchise tax] is certainly a new tax and a new system of arriving at the taxable value"; The method does depart from the system or method heretofore existing of ascertaining the taxable value on which the tax is levied, but it cannot be condemned because it is new.  Experimentation in taxation by the legislature is as lawful as experimentation in other fields.[5]

Did the legislature intend to change its old policy of levying a property tax and create in its stead a franchise tax upon foreign corporations?  We concur with the court below in its conclusion that the tax is a franchise tax and not a property tax.  The legislature in the title to the act called it a franchise tax.  While not conclusive, some weight should be given to this designation in determining the nature of the tax.  See *Opinion of the Justices,* 250 Mass. 591, 148 N. E. 889; *San Francisco v. Liverpool,* 74 Calif. 113, 15 P. 380.  Whether this is a property tax or a franchise tax rests to some extent upon the method of its ascertainment and the

---

[4] *Com. ex rel Kelly v. Clark,* 327 Pa. 181; *Com. ex rel Kelly v. Cantrell,* 327 Pa. 369; *Rohrer v. Milk Control Bd.,* 322 Pa. 257; *Grim v. Weissenberg,* 57 Pa. 433; *Busser v. Snyder,* 282 Pa. 440.

[5] In *Newark Fire Insurance Co. v. State Board of Tax Appeals,* 307 U. S. 313, 59 Sup. Ct. 918, it is stated: "Wise tax policy is one thing; constitutional prohibition quite another.  The task of devising a means for distributing the burdens of taxation equitably has always challenged the wisdom of the wisest financial statesman. Never has this been more true than today when wealth has so largely become the capitalization of expectancies derived from a complicated network of human relations.  The adjustment of such relationships with due regard to the promotion of enterprise and to the physical needs of different governments with which these relations are entwined, is peculiarly a phrase of empirical legislation.  It belongs to that range of the experimental activities of government which should not be constrained by rigid and artificial legal concepts."

incidence of the tax itself. Where a tax is imposed directly on specific property it is a property tax. The incidence of a franchise or privilege tax is upon a franchise or privilege and not upon property or capital. It is true we stated in *Arrott's Estate,* 322 Pa. 367, that there was a close identity between the old capital stock tax [a property tax] and the new franchise tax. But we were there determining whether the owners of shares of stock in foreign corporations which pay taxes to this State should pay a personal property tax on these shares. Having discovered that it was the evident purpose of the legislature to have domestic corporations pay a capital stock tax of 5 mills and foreign corporations a tax of 5 mills on a taxable value, of which an underlying element is capital stock, we held that there was enough similarity between the methods of taxing foreign and domestic corporations to render exempt from personal property tax the shares of stock in foreign corporations, just as shares of stock in domestic corporations were exempt. The basic problem in that case was not the nature of the tax imposed on foreign corporations by the 1935 Act, but rather the problem of the exemption from personal property tax of the shares of stock in such foreign corporations.

Among the standards used for distinguishing a franchise tax from a property tax has been the method adopted for laying them and fixing the amount.[6] It is true that under the Act of 1935 the value of the capital stock is used as an element, as provided in Section 20, but when this value is obtained the taxable value which is fixed by the apportionment method is not, nor

---

[6] It has been stated in *Com. v. Standard Oil Co.,* 101 Pa. 119: "The test, whether the tax in any given case is a franchise as distinguished from a property tax, would seem, from the authorities, to be that a tax according to a valuation is a tax on property, whereas a tax imposed according to nominal value, or measured by some standard of mere calculation—as contrasted with valuation—fixed by the law itself, may be a franchise tax." See also *Society for Savings v. Coite,* 6 Wall. (U. S.) 594.

can it be property in this State. In part, this is demonstrated by the considerations which enter into the valuation and appraisement of capital stock. Capital stock, as that term is employed in the Act, is a valution of the corporation as a business enterprise, not an appraisement of bare worth of tangible and intangible properties. Section 20 of the Act makes it a reflection of the going-concern value of the entire organization. See *Commonwealth v. Delaware, Susquehanna & Schuylkill R. R.*, 165 Pa. 44, 48-49. The determination of the value of the franchise under the amendatory Act may bring into consideration property situated within the Commonwealth, and give to it a functional value as part of an organic unit. But the incidence of the tax is fixed upon the value of the franchise; not upon the property itself. To ascertain that taxable value there must, of course, be a method.

Under the 1935 Act, the underlying element in the ascertainment of the value of the franchise is the value of the entire capital stock of each foreign corporation. We referred to this in *Arrott's Estate*, 322 Pa. 367, as being the base. The attempt to determine what part of the value of this base should be the taxable value called for by the Act is to ascertain with approximate correctness the equivalence of that value which the legislature deemed the franchise or right to do business in this State to have.

Do the factors used in the income tax result in a fair method of determining the taxable measure which should be prescribed for the franchise to do business in this state?

Gross receipts necessarily indicate business done; they are derived from the use of intangibles as well as tangible assets. They are indicative of a going-concern value, which is inherent in the privilege of doing business in the Commonwealth. In applying against one-third of the value of the capital stock the ratio which the gross receipts within the State bear to the total

gross receipts, the result must be to fairly proportion that part of the total taxable value which should be assigned to Pennsylvania. The Act considers the amount of tangible property in the State, compares it with all tangible property and applies it against the same base. Generally speaking, corporate business is transacted through the use of tangibles rather than intangibles. As the ratio of tangible assets in the State to tangibles situated everywhere varies, so it may be said that the value of the corporate franchise within this state varies. Moreover, the intangible worth of a going corporation as well as intangible assets themselves may be said to have some degree of correlation as to situs with tangibles. It was undoubtedly within the power of the legislature to permit this correlation to be worked out through the use of a fraction which considered tangible assets only, leaving a more exact correspondence to be brought about through the interaction and effect of the other fractions composed of gross receipts and payrolls. The fraction composed of the ratio of payroll within this State to payroll everywhere is indicative of corporate activity within this State, whether in the form of manufacturing, selling or otherwise. As these activities increase within this State so it may be said the value of the right to do business in this State increases. If the legislature had chosen to use a single one of these fractions and applied the same to the entire capital stock, certainly it could hardly be contended that it would be without its powers,[7] provided proper consideration be given in each

[7] In *Roberts & Schaefer Co. v. Emmerson*, 271 U. S. 50, a franchise tax on that proportion of authorized capital stock represented *by business transacted and property* located within the state was upheld. In *International Shoe Co. v. Shartel*, 279 U. S. 429, a franchise tax imposed on foreign corporations on that part of their outstanding capital stock and surplus which the property and assets of the foreign corporation within the state bore to all assets and property of the foreign corporation, wherever situated, was upheld. In *Hump Hair Pin Mfg. Co. v. Emmerson*,

case to the elements to be included or omitted in determining the value of the entire capital stock as the measure of the tax. The use of all three and the application of each to one-third of the entire capital stock value is simply an attempt to make the ultimate measure to which the tax is to be applied more representative of the actual worth of the franchise to do business and to allow the interplay of the factors to average out the hardship which might arise by reliance upon any single one.

The Act provides for the ascertainment of taxable value by a measure. In its process it applies allocating fractions to each foreign corporation's entire capital stock value. These fractions, as stated above, concern corporate activity. While they bear some relation to capital stock value, intrinsically they determine the taxable value of the corporate activity within this State rather than of the property located here. That it is the value of the franchise rather than the actual value of the property which is taken into account is clear from the factors which enter into the apportionment. They are the same which this Court considered in *Turco Paint & Varnish Co. v. Kalodner*, 320 Pa. 421, where income was the fundamental base. It does not ascertain physical worth of assets located in this State, but arrives at a value which the functional or operating organic unit within this State possesses. It represents what the right to do business is worth. It must follow

258 U. S. 290, a tax on that proportion of the capital stock determined by averaging the percentage of the total business of the corporation transacted within the state and the percentage of the total tangible property located within this state was upheld. With respect to apportionment of income, there has been sustained an apportionment based upon tangible assets within a state to all tangibles wherever situated; see *Maxwell v. Kent-Coffey Mfg. Co.*, 291 U. S. 642; gross business within the state added to value of property within the state to total gross business and value of total gross assets; see *U. S. Glue Co. v. Town of Oak Creek*, 247 U. S. 321.

that the tax is not levied on property but on the franchise to do business measured by a taxable value secured through the application of the factors of gross receipts, tangibles and payrolls to the capital stock value. It is representative of the value of that very franchise.

Appellee contends that because a corporation's capital stock may be composed of intangible assets, more or less of which may be used in connection with the business done in this State, the formula is inherently arbitrary because the factors do not take this element into consideration. In place of the fraction tangible assets in the State over all tangible assets of the corporation, it contends the fraction should be tangible and intangible assets within the State over entire tangible and intangible assets wherever situate. This argument would have much weight if the legislature were endeavoring to measure property within the State. Since, however, the tax is upon the value of a privilege, it is not necessary that there be an exact measurement of the intangibles within this state. In *Kansas City, Memphis & Birmingham R. R. Co. v. Stiles,* 242 U. S. 111, the Court stated, "While a state cannot tax beyond its borders it may measure a tax within its authority by capital stock which in part represents property without the borders of the state." Moreover, as previously pointed out, there is embraced within the formula factors which bear relation to the intangibles.

In applying the formula set up by the legislature, since the value of the capital stock is used as a measure, the taxable value of the franchise must have some relation to the business done in the taxing state. The Supreme Court of the United States in a number of cases has held that in fixing the taxable value with reference to property and business done within the state where capital stock is used as a measure, the property without the state may be taken into consideration only if it is an organic or functional part of that within the

state. See *Fargo v. Hart,* 193 U. S. 490; *Wallace v. Hines,* 253 U. S. 66; *Norfolk & W. Ry. Co. v. State of North Carolina,* 297 U. S. 682. Where the intangibles are a necessary part of the corporate activity and are within the scheme of corporate functioning, actively or as reserve, there is no reason why they should not be included. If the intangibles acquire a business situs, they, of course, are properly included. See *Commonwealth v. Curtis Publishing Co.,* 237 Pa. 333; *Wheeling Steel Corp. v. Fox,* 298 U. S. 193. Viewing the Act as a whole it cannot be declared to violate either the Federal or State Constitutions or to be so inherently arbitrary as to render it unconstitutional.

It is contended, however, that even if the Act is structurally sound, as to appellee there is an unconstitutional application. An act may be constitutional structurally and yet not in its application to one or more corporations. It is almost impossible for any legislature to fix with certainty a tax measure which will work out equal and exact justice in every instance. But it would be subversive of all government for a court to arbitrarily invalidate an act of assembly because in its judgment the act might be invalid in one or more cases. As was stated in *Field v. Clark,* 143 U. S. 649, at pages 696-697: "a general revenue statute should never be declared inoperative in all its parts because a particular part relating to a distinct subject may be invalid. A different rule might be disastrous to the financial operations of the government and produce the utmost confusion in the business of the entire country."

It is the duty of the courts to sustain the government's measure if it is at all possible to do so. This is plainly illustrated in our zoning laws which we held to be structurally constitutional, although in given instances they might work confiscation.

In *Turco Paint & Varnish Co. v. Kalodner,* 320 Pa. 421, at page 430, we stated of the Corporate Net Income Tax Act and the formula prescribed in it: "The

method or formula stands as the prima facie method of determining the net income. If, in particular cases, its operation will work an injustice or achieve an arbitrary result so far out of line with the actual facts as to cause it to be illegal, or if, in its application, it touches upon particular corporations, which, because of their paramount federal interest, have been held to be immune from burdensome state taxation, then will be the time to consider such charges."

Appellee performs only a part of its functions within the state, and in connection therewith, employs a part of its tangible and some intangible property. Under the principles relating to corporations engaging in multiform business and considering that only part of appellee's business is conducted in Pennsylvania, as far as the capital stock value is related to tangible and intangible property, only such tangibles and intangibles should be taken into account as are concerned with the functions exercised within the state. The facts show under appellee's certificate it is permitted to and has actually limited its business to that of a manufacturing or operating company. The vast amount of its property consists of intangibles used in connection with its holding company business. The record does not disclose satisfactorily that it performs any part of that business within this State. Its power to act as a holding company is authorized under the laws of Delaware. It is obvious therefore that to include within the taxable measure all the property used in connection with this function would be to levy a franchise tax having no relation to the privilege granted by this State to appellee as an operating company or to any function actually performed herein. Analogies are not lacking to sustain this view that such action would violate constitutional privilege. In *Roberts & Schaefer Co. v. Emmerson*, 271 U. S. 50, the Court stated (page 54) of the holding in *Air-Way Electric Appliance Corp. v. Day*, 266 U. S. 71 that a privilege tax could not be levied

on authorized capital stock because "The authority to issue its [the foreign corporation's] capital stock was a privilege conferred by another State and bore no relation to any franchise granted to it by the State of Ohio or to its business and property within that State." See also *Great Atlantic & Pacific Tea Co. v. Grosjean,* 301 U. S. 412. In *Ozark Pipe Line Corp. v. Monier et al.,* 266 U. S. 555, the Court said (pages 566-567) : ". . . so far as this case is concerned the *power to tax depends upon what was done, and not upon what might have been done. Moreover, the license issued by the State authorized appellant to engage 'exclusively in the business of transporting crude petroleum by pipe line.'* "

In view of the fact that the legislature intended only to levy a tax on a measure fairly representative of the corporation's franchise to do business in this State, under the exceptional situation here presented, it is the duty of the Court to construe the Act so as to cause the statute's application to be both constitutional and fair.

Instances are not lacking in which courts have so construed statutes as to uphold them and yet avoid arbitrary results. See *People ex rel., Alpha Portland Cement Co. v. Knapp,* 230 N. Y. 48; *People v. Knapp,* 129 N. E. 202; *Ratherman v. Western Union Telegraph Co.,* 127 U. S. 411; *Singer Sewing Machine Co. v. Brickell,* 233 U. S. 304; *Bowman v. Continental Oil Co.,* 256 U. S. 642. In *Commonwealth v. Standard Oil Co.,* 101 Pa. 119, where the Court had under consideration our previous capital stock tax act, in answer to an argument that the tax in effect brought within the tax base the entire capital stock of a foreign corporation, the Court stated: "we must construe them to mean so much of the capital stock measured by the property actually brought within the state by the company in the transaction of its business."

By these principles it is obvious that since the tax is nothing but one upon the value of a privilege and the

taxable measure is fundamentally the capital stock used in connection with that privilege, we must for the purpose of determining the validity of the tax separate from it that capital stock value which bears no relation to the privilege. In determining the franchise tax to be levied on the Columbia Gas and Electric Company, the value of its assets represented by capital stock used in connection with its holding company business should have been excluded by the taxing officials. In so holding it is to be understood that not all intangibles are to be disregarded for, to the extent that intangibles enter into the exercise of the franchise conferred by this state or privileges actually exercised within the state, such intangible value must properly be included. This redetermination of the tax due the Commonwealth will also require a readjustment in the figures prescribed in the statutory formula. For purposes of making the correct calculation of tax due, it will be essential that the separate phases of the business be determined not only with respect to capital stock values, but also with respect to computation of the statutory fractions.

There may be cases in which a foreign corporation pursues in this State, not merely one (as in the present case), but *all* the activities in which it engages in the state of its domicile, and nevertheless it may own assets, tangibles or intangibles, in its domiciliary state, which bear no fair relation to the value of the franchise enjoyed by the corporation in this State. In such cases such assets must be excluded from the value of the entire capital stock in determining the measure of the tax. Cf. *Hans Rees' Sons v. North Carolina,* 283 U. S. 123.

There are some further objections to the new Act's embodying part of the old Act and to the taking away of the exemption applicable to manufacturing corporations. These are very fully answered by the court below in holding that the tax was for the privilege of doing business in the Commonwealth and was not a property tax.

Appellee also contends that the act is invalid because it discriminates against foreign corporations in favor of domestic ones and therefore violates the equal protection clause of the Federal Constitution. It is sufficient answer to say that this is not a tax in addition to one already imposed, but a new tax which will bring foreign corporations up to the same plane of taxation as domestic corporations. It is scarcely necessary to cite authorities that a state may differentiate in its method of taxing between foreign and domestic corporations. See *Concordia Fire Ins. Co. v. People of the State of Illinois*, 292 U. S. 535. If it attempted to impose a greater tax burden on foreign corporations than it did on domestic corporations similarly situated, appellee would have a just cause of complaint.[8]

The result of the Act's operation is not so obviously wrong and so out of proportion to the business done and property within the State that it can be said to be confiscatory or discriminatory compared with similar domiciliary corporations. In the light of this opinion there is no imposition or unjust burden on this foreign corporation.

Another feature that has been called to our attention is that of unjust discrimination against foreign corporations as to the exemptions allowed domestic corporations. But the conclusion arrived at herein renders discussion of this argument unnecessary. The subject-matter of the domestic corporation exemptions is the

---

[8] It was stated at the Bar of the Court that there were many hundreds of appeals under this Act. The Attorney General informed the Court that up to June 23, 1939, there were 7,780 foreign corporations liable to a franchise tax. During the operation of this statute there were upwards of 23,000 tax settlements made pursuant thereto and of this number there have been appealed to the Court 816. Of this latter figure there are but 366 appeals which raise the constitutionality of the Franchise Act. The remainder are factual disputes. In other words 3½% of the tax settlements have been appealed. There is only approximately 1½% on constitutional questions.

stock of subsidiaries. These no longer enter into the calculation of value of appellee's capital stock. This issue therefore disappears from the case.

Judgment reversed. The record is remitted to the court below with instructions that it be returned to the Department of Revenue to resettle the tax against appellee in accordance with this opinion.