Morewood Realty Corporation *v.* Commonwealth.

Argued April 5, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*William Y. Rodewald,* with him *Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for appellant.

*Edward T. Baker,* Deputy Attorney General, for appellee.

OPINION BY JUDGE ROGERS, August 18, 1972:

This appeal from a decision of the Board of Finance and Revenue requires us to determine the validity of the action of State taxing authorities in including out-of-state assets in settling the franchise tax of a foreign corporation against the taxpayer's claim that the assets and results of its business conducted elsewhere may not be included in computing its tax. The field has been well worked by the Common Pleas Court of Dauphin County and the Supreme Court of Pennsylvania[1] but remains difficult because each case requires the application of very general principles to a factual situation differing in detail from those previously considered.

Morewood Realty Corporation (Morewood) is a Delaware corporation whose principal place of operations is New York City. There, during and before 1966, the tax year in question, its board met, its business was transacted and its books and records were kept. Its corporate charter authorized it to own, lease and deal in real estate, to invest in securities, to manufacture and "to carry on other businesses."[2] Morewood was

---

[1] And once by the Commonwealth Court in *Carheart Corp. v. Commonwealth,* 5 Pa. Commonwealth Ct. 195, 245 A. 2d 220 (1972).

[2] The quoted phrase is from the stipulation accompanying the agreement to dispense with trial by jury. All of the facts were

registered to do business in Pennsylvania under a certificate authorizing it only to own, operate and deal in real estate and to hold and deal in securities.

During 1966, Morewood owned and leased to unrelated tenants through a rental agent two retail store buildings in Pittsburgh. The rental agent managed the properties, collected rents, deducted his fees and deposited the balance in a Pittsburgh bank from which it was withdrawn by Morewood and credited to an account in a New York City bank. Morewood owned separate insurance policies for the Pittsburgh properties. It maintained separate income, expense, asset and liability accounts for the Pennsylvania properties and segregated this activity on its balance sheets and profit and loss statements.

The Pittsburgh buildings were purchased, one in 1965 and the other in 1966, for the total sum of $455,-000. The purchase prices were paid wholly in cash derived from the sale of another Pennsylvania retail store building and from general assets. The buildings produced during 1966 gross rents of $69,688 and a net profit of $1,654, after depreciation and expenses, including local real estate taxes of $42,964.

The taxpayer was engaged wholly in the State of New York in two other enterprises.

It owned and managed a portfolio of marketable securities worth in 1966 about $43,000,000 from which it derived about $1,190,000 in dividends and interest. The securities were held in New York, bought and sold there and the income and other proceeds received and deposited in banks in New York City.

The taxpayer's remaining activity was as the owner of a sand and gravel property on Long Island. Prior to 1956, Morewood itself mined, processed and sold the

---

established by stipulation. We adopt them as the findings of fact of the Court.

sand and gravel on the site; after that time and during 1966, it licensed another corporation to remove the minerals in consideration of royalty payments. In addition it owned sand and gravel machinery, equipment and facilities which it rented to its licensee. The actual value of these properties, real and personal, on December 31, 1966 was $5,095,969. In 1966, Morewood received $105,010 in gross rentals for its machinery, equipment and facilities and $228,700 in gross royalties for sand and gravel removed. All of these receipts were had and held in New York. Morewood was compelled to exercise continuous and extensive oversight of the sand and gravel operation to ensure compliance by the licensee with the agreement with respect to amount of minerals removed and the amount of royalties due, the observance by the lessee of mining regulations, the prevention of pollution from the use of its property, and the surveillance of prices for minerals in the market upon which the royalties are partially based. Because the mining operations were noisy, dirty and unsightly they evoked public antagonism requiring constant attention by Morewood in the prevention of annoyance to the public of Long Island, the satisfaction of complaints and the creation of good will where possible. The taxpayer has engaged in protracted litigation resulting from one condemnation of its property and much activity to prevent another. As the result of an investigation of prices for sand and gravel conducted by Morewood's officers and accountants engaged by it, the taxpayer's royalty income was increased during one two-year period by $166,000.

All sales or purchases of sand and gravel or mining assets were made in New York and all receipts from that activity were received there. None of these activities took place in Pennsylvania. No equipment has ever been transferred from the New York operations to the

Pennsylvania operation or from the Pennsylvania operation to the New York operations.

Morewood had no employees working in Pennsylvania. A vice-president who was also a director resided in Pittsburgh where he had other substantial business interests. His value to the company was with respect to the marketable securities and the New York sand and gravel operations. He visited New York on company business at least once a month. For these services he received a salary of $25,100 a year on which he paid income tax to the State of New York. He did not supervise the Pennsylvania properties.

Morewood's tax for the privilege of earning $1654 on its Pittsburgh rental properties was settled by the Commonwealth Department of Revenue at $6612.55, by including in the computation New York assets and gross receipts from New York activities.[3] Morewood contends that its tax should have been based solely upon the value of its Pittsburgh store buildings as of December 31, 1966.

Under the United States Constitution, when a state imposes a property tax on a corporation doing business within its borders, the Due Process Clause requires ". . . that the property shall be within the territorial jurisdiction of the taxing state for the tax to be

---

[3] The taxpayer had included, it now contends erroneously, New York assets and receipts in its return and using the formulas of the Franchise Tax Act, Act of May 16, 1935, P. L. 184, as amended, 72 P.S. §1871(b), and a value for its capital stock of $24,155,130, assessed its tax at $4563.63. The Department of Revenue increased the valuation of the capital stock to $35,000,000. The petition for review to the Board of Finance and Revenue and the appeal here raise objections both to the inclusion of the New York assets and receipts and to the increase in the capital stock valuation. Since the trial here is de novo, the fact that the taxpayer included its New York assets and receipts in its return is no obstacle to its raising the propriety of that action, and the State's in this regard, here.

valid." *Wheeling Steel Corp. v. Fox*, 298 U.S. 193, 208, 56 S. Ct. 773, 776 (1936). In the *Wheeling Steel Corp.* case, Chief Justice CHARLES EVANS HUGHES stated the following rationale for the rule: "[A]pplication to the states of the rule of due process arises from the fact 'that their spheres of activity are enforced and protected by the Constitution, and therefore it is impossible for one state to reach out and tax property in another without violating the Constitution.'" 298 U. S. at 209, 56 S. Ct. at 776. This rule, originally applied to land, was extended to tangible personal property as well as intangible personalty which may be taxed solely at the domicile of the owner unless it has acquired a business situs elsewhere. In addition, the taxation of property not located within the taxing state may be unconstitutional because it imposes an illegitimate restraint on interstate commerce, thereby violating the Commerce Clause of the Federal Constitution. These principles were recently reaffirmed by the United States Supreme Court in *Norfolk and Western Ry. Co. v. Missouri State Tax Commission*, 390 U.S. 317, 88 S. Ct. 995 (1968).

In the case of a franchise tax, i.e., a tax for the privilege of doing business within a state, the constitutional considerations are much the same. Here, however, the taxing state may consider the value of a company's property in other states if that property is an integral part and enhances the value of property within the taxing state. As Mr. Justice HOLMES expressed it: "The only reason for allowing a State to look beyond its borders when it taxes the property of foreign corporations is that it may get the true value of the things within it, when they are part of an organic system of wide extent, that gives them a value above what they otherwise would possess. The purpose is not to expose the heel of the system to a mortal dart-*not, in other words, to open to taxation what is not within the State.* Therefore, *no property of such an interstate road situ-*

*ated elsewhere can be taken into account unless it can be seen in some plain and fairly intelligible way that it adds to the value of the road and the rights exercised in the State.* (Emphasis supplied.) *Wallace v. Hines,* 253 U.S. 66, 69-70, 40 S. Ct. 435, 436-437 (1920). In *Wallace v. Hines,* the U. S. Supreme Court affirmed the grant of an injunction against the enforcement of a tax imposed on foreign corporations for the privilege to do business within the State of North Dakota. The court concluded that the state's administration of the tax constituted an unjustifiable interference with interstate commerce and a taking of property without due process of law in that it improperly included railroad property in other states not affecting the railroad's property within North Dakota.

We detect in these cases an on-going purpose on the part of the U. S. Supreme Court to keep state taxation of multistate corporations within definite bounds. A different attitude on the part of that Court or the state courts would have a disastrous consequence to our federal system, and ultimately result in either the inability to govern exemplified by the Articles of Confederation or fifty separate economies incapable of supporting the needs of two hundred millions of persons.

Pennsylvania courts have been alert to dangers inherent in state imposts on out-of-state business. After noting that the power of taxation is limited to subjects within the jurisdiction of the state, the Pennsylvania Supreme Court in *Commonwealth v. Standard Oil Co.,* 101 Pa. 119 (1882), held that in imposing a capital stock tax the Legislature intended not to tax the whole capital stock of foreign corporations, irrespective of the place of its investment, but to tax only so much of the capital stock of such company as was represented by its property and business within this state. It further declared that if Pennsylvania desired to tax the capital stock of a foreign corporation, the state would have to

apportion the corporation's stock so as to tax only property over which it has jurisdiction. In *Turco Paint & Varnish Co. v. Kalodner,* 320 Pa. 421, 184 A. 37 (1936), and *Commonwealth v. Columbia Gas and Electric Corp., infra,* our Supreme Court upheld the imposition of a corporate net income tax and the franchise tax on foreign corporations, a tax on the privilege of doing business within the state, by formulas in which out-of-state income, wages and assets were used as a means of arriving at an amount of income or value fairly attributable to Pennsylvania activities. It was recognized in *Commonwealth v. Columbia Gas and Electric Corp.,* 336 Pa. 209, 8 A. 2d 404 (1939), however, that the use of out-of-state properties and activities might not, by constitutional principle, result in taxation in excess of a realistic value of the privilege conferred. Justice KEPHART expressed the limitation as follows:

"Appellee performs only a part of its functions within the state, and in connection therewith, employs a part of its tangible and some intangible property. Under the principles relating to corporations engaging in multiform business and considering that only part of appellee's business is conducted in Pennsylvania, as far as the capital stock value is related to tangible and intangible property, only such tangibles and intangibles should be taken into account as are concerned with the functions exercised within the state. The facts show under appellee's certificate it is permitted to and has actually limited its business to that of a manufacturing or operating company. The vast amount of its property consists of intangibles used in connection with its holding company business. The record does not disclose satisfactorily that it performs any part of that business within this State. Its power to act as a holding company is authorized under the laws of Delaware. It is obvious therefore that to include within the taxable measure all the property used in connection with this

function would be to levy a franchise tax having no relation to the privilege granted by this State to appellee as an operating company or to any function actually performed herein. . . .

"In view of the fact that the legislature intended only to levy a tax on a measure fairly representative of the corporation's franchise to do business in this State, under the exceptional situation here presented, it is the duty of the Court to construe the Act so as to cause the statute's application to be both constitutional and fair.

. . . .

"By these principles it is obvious that since the tax is nothing but one upon the value of a privilege and the taxable measure is fundamentally the capital stock used in connection with that privilege, we must for the purpose of determining the validity of the tax separate from it that capital stock value which bears no relation to the privilege. In determining the franchise tax to be levied on the Columbia Gas and Electric Company, the value of its assets represented by capital stock used in connection with its holding company business should have been excluded by the taxing officials. In so holding it is to be understood that not all intangibles are to be disregarded for, to the extent that intangibles enter into the exercise of the franchise conferred by this state or privileges actually exercised within the state, such intangible value must properly be included.

. . . .

"There may be cases in which a foreign corporation pursues in this State, not merely one (as in the present case), but *all* the activities in which it engages in the state of its domicile, and nevertheless it may own assets, tangibles or intangibles, in its domiciliary state, which bear no fair relation to the value of the franchise enjoyed by the corporation in this State. In such cases such assets must be excluded from the value of the

entire capital stock in determining the measure of the tax. Cf. Hans Rees' Sons v. North Carolina, 283 U.S. 123." *Commonwealth v. Columbia Gas and Electric Corp.,* 336 Pa. at 224, 225, 226, 8 A. 2d at 413, 414.

Thus were established in Pennsylvania the multiform and unrelated asset concepts; the first to provide exclusion from Pennsylvania computations of assets of separate businesses carried on by foreign corporations in other states, and the second to provide exclusion of assets even of a unitary, as opposed to a multiform business, held outside the state and having no relation to the business done in Pennsylvania. The taxpayer here contends both that its business is multiform and that its New York assets are unrelated to its Pennsylvania activity.

The limiting principles of *Columbia Gas and Electric, supra,* did not remain without embellishment. In *Commonwealth v. The Mundy Corporation,* 346 Pa. 482, 30 A. 2d 878 (1943), the State attempted to include in the value of a Delaware Corporation's stock securities held by it as an investment (but not as working capital) and not used in its general real estate business. The court held that the value of these securities could not be included because they had no relation to the value of the Pennsylvania franchise. Justice MAXEY wrote, "The Act of 1935, P. L. 184, amending the Act of 1889, P. L. 420, does not give power to the Commonwealth to levy a capital stock tax or a franchise tax upon securities held and owned by a foreign corporation doing business in Pennsylvania, which have no fair relation to the value of the franchise enjoyed by the corporation in this state. Such assets must be excluded." 346 Pa. at 484, 30 A. 2d at 879-880.

In *Commonwealth v. Kirby Estates, Inc.,* 432 Pa. 103, 246 A. 2d 120 (1968), the taxpayer rented Pennsylvania land to unrelated tenants. Otherwise and outside Pennsylvania it conducted a securities business. As nei-

ther contributed to the functioning of the other, the securities activities were excluded. Justice COHEN wrote: "The question now as it has always been, is what is the value of the corporate franchise being exercised in Pennsylvania, and has there been eliminated therefrom all elements of value bearing no relation to the exercise of the privilege of doing business here? Whether we speak of multiform business activity or unrelated assets, this question remains the same. Here, it is obvious that the taxpayer's presence in Pennsylvania was limited to its ownership of real estate and that its activity in connection therewith was neither enhanced nor diminished by its securities activity outside of Pennsylvania. The two were unconnected in the traditional sense even though they may be broadly joined and categorized by the descriptive verb 'investing'." 432 Pa. at 108, 246 A. 2d at 122.

The cases we cite and all others in the field were studied and synthesized by Justice COHEN in *Commonwealth v. ACF Industries, Inc.*, 441 Pa. 129, 142, 143, 271 A. 2d 273, 280 (1970), as follows:

"First, if a multistate business enterprise is conducted in a way that one, some or all of the business operations outside Pennsylvania are independent of and do not contribute to the business operations within this State, the factors attributable to the outside activity may be excluded.

"Second, in applying the foregoing principle to a particular case, we must focus upon the relationship between the Pennsylvania activity and the outside one, not the common relationships between these and the central corporate structure. Only if the impact of the latter on the operating units or activities is so pervasive as to negate any claim that they function independently from each other do we deny exclusion in this context.

"Third, without attempting to preclude exclusion in any given case, we reiterate our statement above that

the manufacturing, wholesaling and retailing (or manufacturing and selling) activities of a single enterprise are not fit subjects for division and partial exclusion. On the other hand, a truly divisionalized business, conducting disparate activities with each division internally integrated with respect to manufacturing and selling, may well be in a position to make a valid claim for exclusion." The third principle, included here for completeness, has no application to this case, except as emphasizing that our Supreme Court, as should all courts, remains sensitive to the fact that selfish state taxation of multi-state enterprises can, as we have noted, do great mischief in our federal system.

Returning to the facts here, what does the record show? A conscientious examination of every fact discloses none which suggests a relationship of dependence by the Pennsylvania activity upon the ownership of the sand and gravel mine or of the portfolio of marketable securities in New York. We discern no contribution by the New York activities to the Pennsylvania "operation." We find no impact of the New York mine and securities investments upon the Pennsylvania activity. They function entirely independently, so far as this record reveals, from the Pittsburgh real estate activity, and indeed from each other. As for the marketable securities, the instant case is clearly ruled by *Mundy* and *Kirby Estates;* as for the sand gravel property, on this record, it is indistinguishable from *Commonwealth v. Baker-Whiteley Coal Co.,* 60 Dauph. 434 (1950), *exceptions dismissed,* 62 Dauph. 207 (1951), cited approvingly in *Commonwealth v. ACF Industries, Inc., supra.*

We therefore arrive at the following

## CONCLUSIONS OF LAW

1. The value of the portfolio of marketable securities and of the sand and gravel properties owned and managed by the defendant, Morewood Realty Corpora-

tion, should be excluded from the capital stock valuation of the company for the year 1966.

2. The capital stock value for the purpose of ascertaining the amount of the francise tax due for the year 1966 should be confined to the value of the land and buildings situate in Pennsylvania, which according to stipulation was $464,533.

3. The appeal of Morewood Realty Corporation should be sustained.

4. The tax due is therefore $2322.66.

## ORDER

And now, this 18th day of August, 1972, the appeal of Morewood Realty Corporation is sustained and the tax settlement made by the Department of Revenue is disapproved; unless exceptions are filed within thirty (30) days of the filing of this order, the Chief Clerk is directed to enter judgment in favor of the Commonwealth in the amount of $2322.66, which amount having been paid, said judgment shall be marked satisfied, and a credit of $2,240.97 entered on the records of the Department of Revenue.