Commonwealth *v.* ACF Industries, Incorporated, Appellant.

Argued May 25, 1970.   Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*N. David Rahal,* with him *Roy J. Keefer,* and *Metzger, Hafer, Keefer, Thomas & Wood,* for appellant.

*Edward T. Baker,* Deputy Attorney General, with him *William C. Sennett,* Attorney. General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE COHEN, November 12, 1970:

This is an appeal by ACF Industries, Incorporated (ACF), from a settlement of its corporate net income tax for the fiscal year ended April 30, 1962. The sole question is whether it must include the gain on the sale of certain securities in the income reported by it to the Commonwealth of Pennsylvania (Commonwealth) for that year.

ACF is a New Jersey corporation with its headquarters in New York City. It is registered to do business in Pennsylvania. During the year in question, its activities in Pennsylvania included the manufacture of railroad and tank cars, the repair of freight and tank cars (its own and others), the manufacture of pressed steel and pressure vessels and the sale of some products made outside the state. It also carried on these activities, as well as certain aerospace and nuclear engineering operations, outside of Pennsylvania. It concedes that its business enterprise is a unitary one for corporate net income tax purposes.

In April, 1960, ACF purchased 214,500 shares of stock of Republic Aviation Corporation from the estate of Paul Moore. The purchase came about as a result of information acquired by a director of ACF who also served as a director of Bankers Trust Company of New York with Paul Moore. Bankers Trust did business with Republic, and Moore served on Republic's board and frequently mentioned the company. When Moore died, his colleague on Bankers Trust board made the availability of the stock known to ACF. Since ACF had business dealings with Republic, it was interested in exploring an acquisition of Republic's assets or a

merger with Republic and felt there was little risk in acquiring the stock. It consummated the purchase at a price of $24 a share.

Following the purchase, a joint committee was established to explore the acquisition or merger possibilities. In May, 1961, this committee rendered a negative report. ACF then decided to dispose of its Republic stock; and on August 29, 1961 (sixteen months after purchase), it sold all of the shares through a secondary offering at a net price of $47.875 a share. This sale produced a net capital gain of $5,058.299. ACF excluded all of this gain in reporting its corporate net income to Pennsylvania for the year of sale on the theory that this income was from an asset unrelated to its Pennsylvania activities. The Commonwealth disagreed and, after the lower court sustained the Commonwealth's position, the present appeal followed.

Apart from the above, certain other facts appear:

First, in order to finance the purchase of the Republic stock, ACF had to use borrowed funds. In 1958 it had entered into a loan agreement with The Prudential Insurance Company whereby the latter agreed to lend ACF $25,000,000 (half on April 30, 1959, and half on April 30, 1960) for general business purposes. The second half of this loan was taken down by ACF 12 days prior to its purchase of the stock, and in order to use part of these funds for the purchase it obtained Prudential's consent to a modification of certain restrictions in the loan agreement which otherwise would have prevented ACF from so using the funds.

The loan agreement with Prudential called for final repayment by ACF on May 1, 1979, with an annual retirement of $1,000,000 beginning May 1, 1962. ACF made the annual payments from cash generated by its general business activities and, in fact, prepaid the entire remaining balance on the loan on April 30, 1965 (fourteen years early).

Second, ACF handled the Republic stock on its financial statement as a separate item "Investment in common stock of Republic Aviation Corporation" and referred to it as a transaction not related to its normal business operations. It carried on all of its activities relating to the stock at its New York City office. The testimony indicates that the stock was not used as collateral for loans, was not associated with other assets or the reserves of the corporation and produced more than sufficient dividends to pay the interest on that part of the Prudential loan used to acquire it. ACF's tax manager testified that net gains on the sale of stock in no way influenced ACF's business activities or financial planning. Both the dividends and sale proceeds were commingled with ACF's other funds.

Third, before and during ACF's ownership of the Republic stock, it engaged in several joint business activities with Republic. In 1958 Republic was awarded a prime government contract to build and supply F-105 fighter planes to the Federal Government. In a separate award ACF obtained a prime government contract to build and furnish flight simulators to train pilots to fly the F-105 planes. In connection with these separate contracts Republic furnished ACF with data regarding the F-105.

In April, 1960 (prior to the stock purchase), ACF and Republic submitted a joint bid to NASA involving flight testing of nuclear rocket propulsion systems. This bid was rejected on July 29, 1960. From time to time ACF submitted joint bids on federal contracts with other companies. According to the testimony, ACF never acquired stock in any of the other joint bidders, did not consider it necessary to do so in order to influence the award of a government contract and did not obtain the Republic stock in an effort to influence NASA.

Relying heavily on our decision in *Commonwealth v. Minnesota Mining and Manufacturing Company*, 402 Pa. 612, 168 A. 2d 560 (1961), affirming per curiam on the opinion of the lower court at 73 Dauph. 223 (1959), the lower court concluded that the holding of the Republic stock and the gain on its sale were part of a unitary operation and not excludable for Pennsylvania corporate net income tax purposes. Furthermore, it rejected the testimony just mentioned and stated that "certainly an underlying purpose of purchasing the stock was to further these common efforts" of ACF and Republic in dealing with the Federal Government.

Obviously, the problem presented by this case, coming so soon after our disposition of a similar issue in *Commonwealth v. Kirby Estates, Inc.*, 432 Pa. 103, 246 A. 2d 120 (1968), indicates a degree of uncertainty in these matters and justifies a review of the precedents. The cases variously involve two taxes, two exclusionary concepts and a statutory provision.

Both franchise tax and corporate net income tax (or either) may be involved, but the principles are the same. *Commonwealth v. American Telephone and Telegraph Company*, 382 Pa. 509, 514-15, 115 A. 2d 373, 375 (1955). The only difference is in the nature of the tax measure and the impact of this on the question asked. In the former the tax is measured by the apportioned value of the capital stock, and the question is whether the business or asset in question contributes or is related to the exercise of the franchise in Pennsylvania. In the latter the tax is measured by the apportioned net income, and the question is whether the business or asset in question contributes or is related to the conduct of its income-producing activities here. Actually, these two questions are the same, the goal being to tax a proportion of value or income reflecting the value of the Pennsylvania franchise.

Exclusion of value or income is claimed because the taxpayer either (1) is engaged in a separate business outside of Pennsylvania (the so-called "multiform" concept) or (2) owns an asset or assets unrelated to the exercise of its franchise or the conduct of its activities in Pennsylvania (the so-called "unrelated asset" concept). Both have been sustained in the past, and both must be distinguished from the rejected "separate accounting" concept best illustrated in the case of *Commonwealth v. Frank G. Shattuck Company,* 52 Dauph. 190 (1941).

Section 2 of the Corporate Net Income Tax Act of May 16, 1935, P. L. 208, 72 P.S. §3420b, contains the following provision: "Where a corporation in any tax year beginning on or after the first day of January, one thousand nine hundred fifty-six, engages in a separate business outside of Pennsylvania, or owns property having a situs outside of Pennsylvania, which business or property bears no relation to the exercise of the Pennsylvania franchise, the department, with the approval of the Auditor General, may determine the base for the tax imposed by this act for the tax year by excluding from the net income of such corporation as returned to and ascertained by the Federal Government, the net income from the business or property which bears no relation to the exercise of the Pennsylvania franchise. The deduction allowed by this section for dividends received from any other corporation shall be limited to those dividends which remain in the net income after the exclusion hereinbefore authorized in this paragraph. The net income which remains, after the exclusion and deductions authorized in this paragraph, shall be subject to allocations and apportionments as provided in this section using only those factors which pertain to that portion of the net income being allocated and apportioned." This provision was added to section 2 short-

ly after our decision in *Commonwealth v. American Telephone and Telegraph Company,* supra, in which former Chief Justice STERN, writing for the Court, held that the purpose of the multiform and unrelated asset concepts was to avoid an impermissible taxation of value or income by Pennsylvania, that their application required action by an aggrieved taxpayer and that the Commonwealth could not raise the issue if the taxpayer was satisfied with a unitary settlement. While this provision has never been specifically construed by us and while ACF here makes a strong argument that it can only be construed constitutionally by reading the word "may" as "shall", we do not and need not reach this issue here.

The *fons et origo* of our case law is *Commonwealth v. Columbia Gas and Electric Corporation,* 336 Pa. 209, 8 A. 2d 404 (1939). This franchise tax case involved a Delaware corporation headquartered in New York which produced gasoline and natural gas in Pennsylvania but primarily (and outside of Pennsylvania) carried on business as a holding company owning large amounts of intangible assets. Former Chief Justice KEPHART, writing for a unanimous court, sustained the then recently enacted franchise tax against the taxpayer's broad constitutional attack; but he directed a determination of tax based upon exclusion of the value of assets representing the holding company business. He did so in striking language:

"In applying the formula set up by the legislature, since the value of the capital stock is used as a measure, the taxable value of the franchise must have some relation to the business done in the taxing state." 336 Pa. 209, 222, 8 A. 2d 404, 412.

"Under the principles relating to corporations engaging in multiform business and considering that only part of appellee's business is conducted in Pennsylva-

nia, as far as the capital stock value is related to tangible and intangible property, only such tangibles and intangibles should be taken into account as are concerned with the functions exercised within the state." 336 Pa. 209, 224, 8 A. 2d 404, 413.

"In view of the fact that the legislature intended only to levy a tax on a measure fairly representative of the corporation's franchise to do business in this State, under the exceptional situation here presented, it is the duty of the Court to construe the Act so as to cause the statute's application to be both constitutional and fair." 336 Pa. 209, 225, 8 A. 2d 404, 413.

"There may be cases in which a foreign corporation pursues in this State, not merely one (as in the present case), but all the activities in which it engages in the state of its domicile, and nevertheless it may own assets, tangibles or intangibles, in its domiciliary state, which bear no fair relation to the value of the franchise enjoyed by the corporation in this State. In such cases such assets must be excluded from the value of the entire capital stock in determining the measure of the tax." 336 Pa. 209, 226, 8 A. 2d 404, 414.

The significance of the last of these expressions became clear following our decision in *Commonwealth v. Mundy Corporation*, 346 Pa. 482, 30 A. 2d 878 (1943). In this franchise tax case, the Commonwealth attempted to include in the value of the Delaware taxpayer's capital stock certain securities held by it as an investment and not used (as working capital or otherwise) in its general real estate business. Chief Justice MAXEY (for a unanimous Court) ruled that these assets had no relation to the value of the corporation's franchise in Pennsylvania and could not be included in the capital stock value. It is interesting to note that the record in this case indicates that the taxpayer's only office was in Pennsylvania, that the securities were kept

in Pennsylvania and that all income was deposited in bank accounts in Pennsylvania. Nevertheless, we adhered to the exclusionary rule of the *Columbia Gas* case.

In two franchise tax cases decided shortly thereafter, we dealt with taxpayers whose activities were not multiform. In *Commonwealth v. Ford Motor Company*, 350 Pa. 236, 38 A. 2d 329 (1944), and *Commonwealth v. Quaker Oats Company*, 350 Pa. 253, 38 A. 2d 325 (1944), both foreign corporations attempted to show multiform business operations consisting of (1) purchasing and production or storage of raw materials, (2) manufacturing of finished products, (3) in Ford's case, assembling of finished automobiles and (4) selling of finished products. The facts indicated, however, that both companies were integrated, unitary enterprises of which the listed functions were interrelated parts. Neither case involved a situation "in which a corporation conducts diverse forms of business having no unity save unity of ownership, and no common relation save by separate contributions to the total revenue of the corporation." 350 Pa. 253, 257, 38 A. 2d 325, 327.

Many years later we were faced with the corporate net income tax case relied on heavily by the court below. In *Commonwealth v. Minnesota Mining and Manufacturing Company*, 402 Pa. 612, 168 A. 2d 560 (1961), we adopted the opinion of the lower court rejecting the taxpayer's claim that it was engaged in multiform business activities in which its income from royalties (from licensing of its patents) and technical fees was unrelated to its general mining and manufacturing business. The opinion stated the interrelationship succinctly: "Considering the business of the defendant as a whole we cannot escape the conclusion that research, inventions, patents, licenses, etc., owned

and controlled to such a large extent are a most important feature of the defendant's business. The end result of all these things is to establish a manufacturing process applying the patents. It is our considered judgment that the business of the defendant is so intertwined with these patents that they contribute markedly to the value of the business transacted in Pennsylvania and to the privilege granted." 168 A. 2d 560, 564.

We most recently discussed the problem in the franchise tax case of *Commonwealth v. Kirby Estates, Inc.,* 432 Pa. 103, 246 A. 2d 120 (1968). There, we dealt with a Delaware corporation which acquired a tract of real estate in Pennsylvania and rented it to unrelated tenants. Otherwise and wholly outside of Pennsylvania, the taxpayer conducted a general securities investment business. Neither contributed to the functioning of the other, and we allowed an exclusion for the securities activities on the ground that the taxpayer was carrying on two distinct businesses. In so doing, we reaffirmed the principle of the *Quaker Oats* case, supra, that contributions of unrelated activities to the corporate whole do not vitiate a claim for exclusion, that it is the interrelationship between the activities themselves which is the critical factor.

In addition to these decisions, there are a number of cases decided by the lower court (and not appealed) which are illustrative. *Commonwealth v. Baxter, Kelly & Faust, Inc.,* 53 Dauph. 73 (1942), was similar to the *Mundy* case except that the unrelated securities and the company's principal office were in New York, not Pennsylvania. Thus, the one weakness of the *Mundy* situation—the presence of the company's commercial domicile in this state—was absent; and the court's decision excluding the unrelated securities (i.e., they were not held or used as reserves for corporate functioning) is justified.

*Commonwealth v. United Biscuit Company,* 56 Dauph. 163 and 182 (1944), involved a multiform business activity claim for both franchise tax and corporate net income tax purposes. The company operated through sixteen divisions, three of which conducted activities in Pennsylvania; and it sought to pay tax only on the value of and income from these three divisions. The lower court denied the claim although the facts indicated that each division operated independently of the other in its purchasing, bookkeeping, advertising, packaging, production and marketing activities. Reliance was placed on the uniform corporate policy imposed with regard to price schedules, Federal Wage and Hour laws, Social Security procedures, handling of taxes and insurance and central executive office management. We view this decision somewhat skeptically today because the factors relied upon to characterize the enterprise as unitary are precisely those things which do *not* involve the interrelationship between operating divisions but rather the interrelationship between each division and the corporate superstructure— factors which would likely appear in every case, no matter how independently each division operated from the other.

*Commonwealth v. Eaglis Corporation,* 56 Dauph. 227 (1945), involved the franchise tax of a Delaware corporation conducting business much like *Mundy Corporation.* It conducted a real estate business and held securities for investment. All of its business was transacted from a Pennsylvania office except that several directors' meetings were held outside the State. The court held for the Commonwealth, however, because the certificate of authority granted to the corporation by Pennsylvania authorized it to carry on not just its real estate business (the only authorization granted to Mundy) but also an investment and holding company

business. This addition was critical, according to the court. We tend to agree with the result, more particularly, however, because of what we said above about *Mundy* to the effect that all of the company's actual business activities were centered in this State.

The most classic multiform corporate net income tax case has to be *Commonwealth v. Baker-Whiteley Coal Co.*, 60 Dauph. 434 (1950), exceptions dismissed, 62 Dauph. 207 (1951). This West Virginia corporation with its principal office in Maryland engaged solely in the business of mining coal in Pennsylvania. Outside the State it carried on a tugboat business. Except for a *de minimis* use of its coal on its tugboats, the company's two businesses were completely separate in operation; and certain common corporate expenses were prorated. The court excluded from Pennsylvania tax the net income derived from tugboat activity.

A better analysis than that of the *United Biscuit* case appears in *Commonwealth v. The L. D. Caulk Co.*, 11 Pa. D. & C. 2d 218, 69 Dauph. 289 (1956). As did Ford Motor and Quaker Oats before it, *Caulk* attempted to separate its general dental supply business into fragments: a manufacturing and wholesaling business division operating in and from Delaware and a retail business division operating in and from Pennsylvania. The court denied this obviously improper claim, stating: "Multiformity in business activity exists where two separate and segregated enterprises are not related to each other and are conducted as separate and independent units, and the corporation derives benefits from each independent unit that are not related to the operation of the other units." 11 Pa. D. & C. 2d 218, 223, 69 Dauph. 289, 293.

As this last case well illustrates, it is virtually impossible to envision a successful multiform claim based upon a separation of vertical functions of a corpora-

tion where the selling function deals in the products of the manufacturing and/or wholesaling functions. We would add to the court's statement, however, the already mentioned factor that performance by the corporate whole of policy, administrative, research and similar functions for otherwise independently operating units does not vitiate multiformity any more than does their common but independent contribution of benefits to the corporate whole.

Except for our questions regarding the *Mundy* and *United Biscuit* cases, we find in this reasonably well-traversed area a consistent attempt to allocate to Pennsylvania that fair share of value or income reflective of activity here and to exclude value or income not contributing to the exercise of the Pennsylvania franchise. Since we deal in these multiform or unrelated asset cases with an apportionment dependent on factual considerations, each case, naturally, is unique. Nevertheless, the principles are clear.

First, if a multistate business enterprise is conducted in a way that one, some or all of the business operations outside Pennsylvania are independent of and do not contribute to the business operations within this State, the factors attributable to the outside activity may be excluded.

Second, in applying the foregoing principle to a particular case, we must focus upon the relationship between the Pennsylvania activity and the outside one, not the common relationships between these and the central corporate structure. Only if the impact of the latter on the operating units or activities is so pervasive as to negate any claim that they function independently from each other do we deny exclusion in this context.

Third, without attempting to preclude exclusion in any given case, we reiterate our statement above that

the manufacturing, wholesaling and retailing (or manufacturing and selling) activities of a single enterprise are not fit subjects for division and partial exclusion. On the other hand, a truly divisionalized business, conducting disparate activities with each division internally integrated with respect to manufacturing and selling, may well be in a position to make a valid claim for exclusion.

A discussion of these matters appear in Hellerstein, *Recent Developments in State Tax Apportionment and the Circumscription of Unitary Business,* XXI National Tax Journal 487 (December, 1968), see, particularly pp. 496-503. While we are not prepared at this stage (and need not in this case) to go as far as Hellerstein in permitting exclusion of a business activity outside the state identical to one carried on inside the state where each operates independently of the other (as he says appears in the case of *Superior Oil Co. v. Franchise Tax Board,* 60 Cal. 2d 406, 34 Cal. Reptr. 545, 386 P. 2d 33 (1963) cited in the article), we otherwise feel his analysis is a valid one. We note, also, that in the *Superior Oil* case, non-California assets were used to obtain funds to support California operations and non-California operating funds were transferred to California to finance projects there. To this extent we have customarily found an interdependence of business activities and have not considered such factors simply additional "centralized operations" properly carried out by the corporate executive office (as we agree are the legal, accounting and research activities) without infringing on otherwise multiform activities.

Because of this feature of the *Superior Oil* case we leave open the principle suggested by Hellerstein insofar as it would apply to a company doing outside of Pennsylvania what it does in Pennsylvania but in a truly independent way. We note the recent decision

in *Commonwealth v. Taft Broadcasting Company,* 92 Dauph. 203 (1969), but find it inappropriate to comment on this point without the record before us.

Returning to the case before us, then, what does the record reveal? Fairly taken, it reveals an isolated investment designed to motivate study of a possible corporate combination, undertaken without substantial risk and disposed of as soon as the purpose was completed, albeit wthout positive action. In no way is the lower court's conclusion that the acquisition of Republic's stock by ACF was designed to further their common business efforts justified. The F-105 contracts were totally unrelated events and were entered into two years prior to the stock purchase. The NASA bid was submitted a month before the stock purchase and rejected three and one-half months later, but ACF held the stock until the merger possibilities were eliminated a year later. Other joint bids led to no similar purchases. In short, the factual inferences supported by the record are completely contrary to that stated by the court below.

The other factor relied on by the lower court—the use of the sale proceeds for general business purposes— is insufficient to justify its conclusion. There hardly would have seemed available to ACF any other use for the proceeds once it disposed of the stock in this isolated undertaking. Moreover, it is the use of the stock itself which is critical. Absolutely nothing indicates that this asset—the stock—was used in any way which was related to or contributed to ACF's business in Pennsylvania. Because the facts indicate just the opposite to be true, we can only conclude that this asset was unrelated to the exercise of ACF's Pennsylvania franchise and that the sale proceeds should be excluded from its income and apportionment fractions in computing ACF's corporate net income tax for the year ended April 30, 1962.

The parties have stipulated to the proper computation of tax in this case. In view of our determination ACF's tax should be resettled at $17,452.67.

The judgment of the court below is reversed, and the case is remanded to the lower court for the entry of a judgment consistent with this opinion.

Mr. Justice ROBERTS concurs in the result.