## Commonwealth v. Emhart Corporation, Appellant.

398

Argued November 12, 1970. Before Jones, Cohen, Eagen, O'Brien, Roberts and Pomeroy, JJ.

*Sheldon M. Bonovitz,* with him *Duane, Morris & Heckscher,* for appellant.

*Edward T. Baker,* Deputy Attorney General, with him *Fred Speaker,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, June 28, 1971:

Two issues are presented in this appeal: (1) whether appellant Emhart Corporation, in computing its Pennsylvania Corporate Net Income Tax for 1964, properly excluded its capital gain realized on the sale of Monsanto Chemical Company stock from income to be allocated to Pennsylvania on the ground that the capital gain was unrelated to appellant's Pennsylvania business and bore no relation to the exercise of the privilege of doing business in Pennsylvania; and (2) whether, in computing its Pennsylvania Corporate Net Income Tax for 1964, appellant properly deducted its subpart F income (as defined by Section 952 of the Internal Revenue Code) and the taxes deemed to have been paid thereon as dividends received from any other corporation as provided for in Section 2(1)(b) of the Corporate Net Income Tax Act, Act of May 16, 1935, P. L. 208, as amended, 72 P.S. §3420 b1 (b). We agree with

the Court of Common Pleas of Dauphin County (Commonwealth Docket)[1] that the exclusion of the capital gain was erroneous. However, we disagree with the view that the deduction of the dividend by appellant was improper and accordingly reverse that portion of the trial court's order.

## I.  Exclusion of Capital Gain

The pertinent facts have been stipulated by the parties. Emhart *Manufacturing* Company was originally a business corporation organized under the laws of Delaware in 1922 for the purpose of manufacturing glassmaking and packaging machinery and equipment. Its plant and principal office were located in Connecticut, and from the time of its incorporation until June 30, 1964, the date of its merger with appellant, it owned no offices or plants in Pennsylvania.

American Hardware Corporation (appellant, under a former name) was originally in the business of manufacturing builders' hardware, with its principal plant and home office in Hartford, Connecticut. In time, American Hardware expanded its business to include the manufacture of sporting firearms and refrigeration equipment; in the process, it acquired a plant in Lancaster, Pennsylvania, on March 1, 1962.

Then, on June 30, 1964, Emhart *Manufacturing* Company and American Hardware Corporation merged, with American Hardware being the surviving corporation. No gain or loss was recognized for federal tax purposes. The survivor's name was changed to Emhart Corporation—appellant in the present case.

---

[1] Now the Commonwealth Court, see Pennsylvania Constitution, Art. V, Sec. 4 as implemented by The Commonwealth Court Act, Act of January 6, 1970, P. L. (1969) 434, 17 P.S. §211.1 et seq. (Supp. 1971) ; see also, Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P. L. 673, Art. IV, 17 P.S. §211.401 et seq. (Supp. 1971).

Certain corporate acquisitions prior to the merger must be set forth. In 1935, Emhart *Manufacturing* Company incorporated Plax Corporation in Delaware to develop inventions of the Fernplas Corporation, another Delaware corporation. Emhart *Manufacturing* eventually acquired Fernplas for cash and liquidated it into itself, thereby gaining title to any patents owned by Fernplas. Plax continued to develop machinery and to manufacture plastic products. Its home office and plant were located in Connecticut.

In 1953, Emhart *Manufacturing* sold one-half of the stock of Plax to Owens-Illinois Glass Company. In 1957, Owens-Illinois in turn transferred its one-half interest in Plax to Monsanto Chemical Company in exchange for Monsanto stock. In 1962, Monsanto acquired the remaining one-half of Plax stock from Emhart *Manufacturing* in exchange for Monsanto stock. As a result of these transactions, Emhart *Manufacturing* acquired a total of 308,219 shares of Monsanto common stock.

In February, 1964, Emhart *Manufacturing* borrowed $30,000,000 from the Bankers Trust Company in New York. At the time of the loan, merger negotiations between Emhart *Manufacturing* and appellant were already underway. The bank, Emhart *Manufacturing,* and appellant had an unwritten understanding that if any of Emhart *Manufacturing's* Monsanto stock were sold, the proceeds would be used to reduce the $30,-000,000 loan.

When Emhart *Manufacturing* received the $30,000,-000, it immediately used the money to acquire 602,089 shares of American Hardware Corporation's stock at $50 per share, to forestall attempts by various persons to gain control of appellant. The largest block of stock, which amounted to approximately 42 percent of that outstanding on appellant's books, had been held by Glen Alden.

To capsulize, when appellant (then American Hardware Corporation) and Emhart *Manufacturing* merged on June 30, 1964, Emhart *Manufacturing* owned 602,089 shares of appellant's stock and 308,219 shares of Monsanto stock, while owing $30,000,000 to the Bankers Trust Company. Subsequent to the merger, appellant (now Emhart Corporation) retired the 602,089 shares of its own stock acquired in the merger.

On November 19, 1964, appellant sold 180,598 shares of Monsanto for $15,000,000. The proceeds and an additional $10,000,000 were used to reduce the $30,000,000 indebtedness which appellant had acquired in the Emhart *Manufacturing* merger.

Appellant reported a capital gain of $13,637,858 on Schedule D of its federal income tax return by reason of the sale of Monsanto stock. In computing the income to be allocated to Pennsylvania on the Pennsylvania Corporate Net Income Tax report, appellant excluded the capital gain derived from the Monsanto stock sale. Its return discloses a net income to be allocated of $5,740,012. On the other hand, the Commonwealth's original settlement of appellant's Corporate Net Income Tax for that year shows a net income to be allocated of $19,892,697. The difference of $14,152,685 consists of the $13,637,858 capital gain on the sale of Monsanto stock and the $514,827 of subpart F income and taxes discussed in a separate portion of this opinion.

Appellant filed a timely petition for resettlement, which was refused. Appellant then petitioned for review before the Board of Finance and Review, which was also refused. Emhart next appealed to the Court of Common Pleas of Dauphin County (Commonwealth Docket). After an original appeal bond was filed, the matter was tried before the court en banc upon a stipulation of facts and agreement to try without a jury. On January 2, 1970, the court denied relief in a per

curiam order. Appeal was taken to our Court. Pursuant to Rule 63 of our Rules, The Dauphin County Court (SWOPE, P. J.) filed an opinion on May 26, 1970, indicating its reasons for the issuance of its January 2, 1970 order.

Appellant stresses with regard to the capital gain question that the Monsanto stock sale bears no relation to the value of its Pennsylvania franchise or the exercise of its privilege of doing business in Pennsylvania. We are unpersuaded.

A corporate taxpayer can exclude income from its income tax return in this Commonwealth for two reasons: ". . . the taxpayer either (1) is engaged in a separate business outside of Pennsylvania (the so-called 'multiform' concept) or (2) owns an asset or assets unrelated to the exercise of its franchise or the conduct of its activities in Pennsylvania (the so-called 'unrelated asset' concept)." *Commonwealth v. ACF Industries, Inc.*, 441 Pa. 129, 135, 271 A. 2d 273, 276 (1970). Appellant admits that its numerous divisions and foreign and domestic subsidiaries were treated as a unitary business enterprise for corporate net income tax purposes. Hence, the instant case is unlike *Commonwealth v. Columbia Gas & Electric Corporation*, 336 Pa. 209, 8 A. 2d 404 (1939), where the Court concluded that the taxpayer was engaged in a multiform business, and only that portion of the business conducted in Pennsylvania could be considered for tax purposes. Since Emhart Corporation is admittedly a unitary business, if it is to prevail on the capital gain issue, it must do so on the unrelated asset theory.

Initially we note that in determining the amount of net income allocable to the state, the burden is on the taxpayer to show by clear and cogent evidence that the taxing formula resulted in extraterritorial values being taxed. *Commonwealth v. American Telephone and Telegraph Company*, 382 Pa. 509, 516 n. 2, 115 A. 2d 373,

376 n. 2 (1955) ; cf. *Butler Brothers v. McColgan, Franchise Tax Commissioner of California,* 315 U.S. 501, 62 S. Ct. 701 (1942). The proper standard to be utilized in evaluating whether a taxpayer has satisfied his burden as to an unrelated asset is to determine if there is clear evidence that the asset is not " 'a necessary part of the corporate activity'." *Commonwealth v. The Mundy Corporation,* 346 Pa. 482, 484, 30 A. 2d 878, 879 (1943) ; accord, *Commonwealth v. Baxter, Kelly and Faust, Inc.,* 53 Dauph. 73 (1942). This was the standard used by the trial court, and we believe its determination of this issue was correct.

An analysis of the transaction reveals that it was more than a capital restructuring designed to increase shareholder equity in Emhart by means of a purchase and cancellation of its issued and outstanding shares— a view urged by appellant. As a result of the merger, Emhart acquired, inter alia, the Monsanto stock and the $30,000,000 indebtedness. The latter became an item of general indebtedness for appellant, which was concededly a corporation engaged in a unified business enterprise in furtherance of its corporate development both within and outside of this Commonwealth.

Appellant contends that because it did not treat the Monsanto stock as a general asset, carried the stock in a separate investment account, and used the stock dividends for charitable purposes, its business activity was in no way related to this asset. We disagree.

All cash dividends produced by the Monsanto stock were retained for Emhart's general corporate purposes. Furthermore, as the trial court stressed, appellant consented to a restriction on the use of the stock sale proceeds. A relationship was thus created between the stock and the debt, and the stock was in fact used to retire a portion of Emhart's general indebtedness. We believe the capital gain proceeds from this sale contributed substantially to a scheme of corporate functioning

and the business potency of appellant, and accordingly should be considered in the determination of appellant's income allocable to Pennsylvania. See *Commonwealth v. United States Biscuit Company*, 56 Dauph. 163, 173 (1944).

Finally on this issue, we are unmoved by appellant's argument that the Monsanto stock sale should not be taxed because had the merger been accomplished by a reorganization pursuant to Section 368(a)(1)(B) of the Internal Revenue Code, a sale of the Monsanto stock by Emhart *Manufacturing* Company would not have been imputed to appellant. Different tax consequences follow from the choice of any of the six types of reorganization set forth in Section 368(a)(1), and considerable tax planning is necessary to perceive the most desirable alternative in a given situation, for the federal statutory scheme relating to corporate reorganizations is as complex as any in the Code (or elsewhere).[2]

---

[2] If a business transaction qualified as a "reorganization" under Section 368(a)(1) of the Internal Revenue Code, various other operative rules of the Code provide that no gain or loss will be recognized at that time. See e.g., Sections 354, 356, 357, 358, 361, 362(b), and 381.

"Reorganization" is a term of art, and can include mergers, consolidations, recapitalizations, acquisitions, and changes in form or place of organization. The statutory definition looks primarily to form, rather than substance, however, which is the weakness of appellant's argument. The form of the reorganization is often crucial. In practice, the basic patterns of the six types of reorganizations—(statutory mergers and consolidations (Type A), acquisitions by one corporation of the stock or assets of another (Types B and C), transfers to uncontrolled corporations (Type D), recapitalizations (Type E), and changes in form or place of organization (Type F))—often overlap, so that, as two of the foremost authorities in this area have observed: ". . . tax consequences may vary depending upon which statutory category of reorganization is deemed controlling. This, in turn, may depend on the form of the transaction, the amount and character of the consideration exchanged, and the change in the parties' legal and economic rela-

Appellant did not utilize a B reorganization, and the hypothetical tax liability under that situation is not now before us. The fact remains that it was appellant who sold the Monsanto stock. We do not believe appellant has met its burden of demonstrating that the asset was clearly unrelated to its corporate enterprise.

## II.  Deduction of Subpart F Income

Section 2 of the Corporate Net Income Tax Act, supra, defines net income as ". . . taxable income for the calendar year or fiscal year as returned to and ascertained by the Federal Government. . . ." Act of May 16, 1935, P. L. 208, §2, as amended, 72 P.S. §3420 b1(b). However, the same section contains a proviso that ". . . additional deductions shall be allowed from taxable income on account of dividends received from any other corporation but only to the extent that such dividends are included in taxable income as returned to and ascertained by the Federal Government. . . ." Id.

Pursuant to this provision, appellant deducted $514,-827 from its tax base in its 1964 Corporate Net Income Tax report. That sum consisted of $382,447 of "subpart F income" as defined by Section 952 of the Internal Revenue Code[3] and taxes paid on the subpart F income

---

tionships to the properties involved and among themselves." Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders 507 (2d ed. 1966).

[3] The statute provides:

"(a) In general—For purpose of this subpart, the term 'subpart F income' means, in the case of any controlled foreign corporation, the sum of—

(1) the income derived from insurance of United States risks (as determined under section 953), and

(2) the foreign base company income (as determined under section 954).

"(b) Exclusion of United States income.—In the case of a controlled foreign corporation, subpart F income does not include

in the amount of $132,380, as required by Sections 78 and 960 of the Code.

While it concedes that the amount claimed by appellant as a deduction is a "dividend" according to the Federal Government, the Commonwealth challenges the

---

any item of income from sources within the United States which is effectively connected with the conduct by such corporation of a trade or business within the United States unless such item is exempt from taxation (or is subject to a reduced rate of tax) pursuant to a treaty obligation of the United States.

"(c) Limitation.—For purposes of subsection (a), the subpart F income of any controlled foreign corporation for any taxable year shall not exceed the earnings and profits of such corporation for such year reduced by the amount (if any) by which—

(1) an amount equal to—

(A) the sum of the deficits in earnings and profits for prior taxable years beginning after December 31, 1962, plus

(B) the sum of the deficits in earnings and profits for taxable years beginning after December 31, 1959, and before January 1, 1963 (reduced by the sum of the earnings and profits for such taxable years) ; exceeds

(2) an amount equal to the sum of the earnings and profits for prior taxable years beginning after December 31, 1962, allocated to other earnings and profits under section 959(c)(3).

"For purposes of the preceding sentence, any deficit in earnings and profits for any prior taxable year shall be taken into account under paragraph (1) for any taxable year only to the extent it has not been taken into account under such paragraph for any preceding taxable year to reduce earnings and profits of such preceding year.

"(d) Special rule in case of indirect ownership—For purposes of subsection (c), if—

(1) a United States shareholder owns (within the meaning of section 958(a)) stock of a foreign corporation, and by reason of such ownership owns (within the meaning of such section) stock of any other foreign corporation, and

(2) any of such foreign corporations has a deficit in earnings and profits for the taxable year, then the earnings and profits for the taxable year of each such foreign corporation which is a controlled foreign corporation shall, with respect to such United States shareholder, be properly reduced to take into account any deficit described in paragraph (2) in such manner as the Secretary or his delegate shall prescribe by regulations."

deduction because the pertinent language in Section 2, quoted above, refers to dividends "received". Emhart did not in fact physically receive the dividends during the 1964 tax year, and the Commonwealth urges that the deduction is consequently improper. The trial court agreed.

The defect with the Commonwealth's position on this issue in our view is that, if nothing else, Section 2 of the Pennsylvaia Corporate Net Income Tax Act evinces a clear legislative determination that a corporation at some point is entitled to a deduction for dividends received from other corporations, presumably to avoid a double tax at the corporate level. The pertinent statutory language states that the deduction is allowed if the ". . . dividends are included in taxable income as returned to and ascertained by the Federal Government. . . ." Act of May 16, 1935, supra, 72 P.S. §3420b 1(b). It is therefore apparent that unless a dividend is reported to the Federal Government, it is not entitled to be deducted on the Pennsylvania return. Hence, if a corporation fails to take the deduction in the year it included the dividend in its federal return, it is unclear whether the corporation can ever take advantage of the deduction in a later year, for while the corporation will have "received" the dividend, it will not have included that sum in its federal return—a prerequisite for the deduction.

Confronted with this dilemma, it is our view that the overriding policy concern should be the Legislature's determination that corporations have the benefit of this deduction. As we observed in *Commonwealth v. General Refractories Company*, 417 Pa. 153, 207 A. 2d 833 (1965): "While the precise language of the Act is not a model of clarity in regard to the question before us, we are convinced that the adjustment to taxable income for dividends received can be explained only in terms of the Federal Code. The dividends received de-

duction stated in the Act is primarily an extension of the already permitted 85% deduction allowed by the Code; and it would be illogical to hold that while the latter 85% is determined by reference to the federal concept of dividends, the former 15% is computed only by reference to some differing state standard. That the state deduction also encompasses a 100% deduction when the dividends received are from certain foreign corporations does not alter our conclusion. It is not the quantum or source of the dividend that governs; it is the nature of the receipt. Pennsylvania has chosen to treat all dividends alike, no matter what their source, as long as they are included in federal taxable income. "...

"... If a particular receipt is includible in federal gross income as a dividend, then its characterization as such must follow through to the full state deduction for dividends received, whether this be for the remaining 15% of dividends received from United States corporations or the entire 100% received from certain foreign corporations." Id. at 161-62, 207 A. 2d at 837 (footnote omitted).

It is therefore our view that the Court of Common Pleas of Dauphin County correctly determined that appellant improperly excluded $13,637,858 of capital gain from its Corporate Net Income Tax report, but incorrectly held that a deduction of subpart F income in the amount of $514,827 was also improper.

The order of the Court of Common Pleas of Dauphin County is modified to provide that appellant's net income to be allocated to Pennsylvania in 1964 was $19,377,870. Taxes and interest should be assessed accordingly, and the record is remanded for the entry of judgment consistent with this opinion.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

Mr. Justice COHEN took no part in the decision of this case.