Logan Clay Products Company, Appellant, *v.* Commonwealth of Pennsylvania, The Board of Finance and Revenue, Appellee.

Argued September 5, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Henry W. Fulton, Jr.,* with him *William J. Kenney* and *Kenney, Stevens, Clark & Semple,* for appellant.

*M. David Smeltz,* Deputy Attorney General, for appellee.

OPINION BY JUDGE KRAMER, January 28, 1974:

This is an appeal filed by Logan Clay Products Company (Logan) from an order of the Board of Finance and Revenue (Board) denying Logan's petition for resettlement of Logan's Corporate Net Income Tax for the fiscal year ending November 30, 1964. Logan had reported its Corporate Net Income Tax as $1,614.45 and had filed its tax return timely. On January 18, 1966, the Department of Revenue (Department) mailed Notice of Settlement to Logan assessing a *deficiency* in its

Corporate Net Income Tax for the said period in the amount of $5,031.18 (exclusive of interest and penalty). The Department settled the tax at $6,645.63, thereby creating the alleged deficiency. After the appeal was filed, the matter came up for a hearing de novo before this Court. A record was made, the matter was fully briefed and argued before the Court en Banc. It is now ripe for determination.

The basic issue before the Court is whether Logan, which operates in several states, is engaged in a unitary or multiform business for Pennsylvania Corporate Net Income Tax purposes. The determination of that issue will resolve all of the questions raised by Logan and the Board.

### FINDINGS OF FACT

1. The Logan Clay Products Company (Logan) is an Ohio corporation, having its principal place of business in Logan, Ohio.

2. Logan is engaged at Logan, Ohio in the business of manufacturing unglazed vitrified clay sewer pipe (hereafter sometimes referred to as the Ohio Division).

3. On June 30, 1958, Logan was merged with Graff-Kittanning Clay Products Company (Graff-Kittanning), a Pennsylvania corporation. As a result of this merger, Logan acquired, and has since operated as a separate division, two plants located in Pennsylvania, near Kittanning, Armstrong County, Pennsylvania (hereafter sometimes jointly referred to as the Pennsylvania Division). The Pennsylvania Division was purchased for approximately $1,800,000 ($1,300,000 by loans from Pennsylvania banks, and the balance was paid from a bank account of Logan in Ohio). Payments on these loans were made from Ohio.

4. One of the Pennsylvania Division plants, known as Worthington Ceramics, was located at Worthington,

Pennsylvania and was engaged in manufacturing drain tile, building tile and flue liners (sometimes referred to separately as Worthington). The other plant in the Pennsylvania Division, also located in Worthington, Pennsylvania, is known as Graff-Kittanning Clay Products (sometimes referred to separately as Graff), and was engaged in the manufacture of certain types of salt-glazed vitrified clay sewer pipe and flue lining.

5. On February 6, 1967, the Department of Revenue (Department) mailed to Logan a Notice of Settlement assessing the Corporate Net Income Tax for the fiscal year ended November 30, 1964 (tax year) in the amount of $8,260.08 (including penalty), as a result of an alleged understatement of appellant's Corporate Net Income Tax liability.

6. A tax deficiency in the amount of $5,031.18 was assessed against the appellant, due to its reporting its Net Income from its Pennsylvania business on a separate or multiform basis.

7. Prior to the merger in 1958, the Ohio Division did no business in Pennsylvania and was not subject to its corporate taxes.

8. After the merger (June 30, 1958), the Pennsylvania Division continued to operate as a separate entity as it had before the merger.

9. After the merger and during the tax year in question, the two divisions (Pennsylvania and Ohio) were operated as two separate and distinct businesses.

10. Separate books and records were kept for each division.

11. Separate accounting records, balance sheets, profit and losses, were made for the Pennsylvania Division and the Ohio Division.

12. The Ohio Division was operated by Barton A. Holl, President and General Manager; Robert Sparnon, Secretary-Treasurer; Barton S. Holl, Vice President of Production; Richard H. Brandt, Vice President of

Administration; and Richard H. Holl, Vice President of Sales, all of whom are residents of Ohio.

13. The Ohio Division was originally established in 1890, and had operated independently as a business until its merger with Graff-Kittanning in 1958.

14. The stockholders of Logan Clay Products Company, before and after the merger, were basically residents of Ohio.

15. John Frantz, a Pennsylvania resident and Pennsylvania Division Manager, is a stockholder. Most of the stockholders of Logan Clay Products Company reside in Ohio.

16. The Pennsylvania Division operated with a minimum of guidance from the Logan officials in Ohio.

17. Only limited supervision was given to the operations of the Pennsylvania Division; this being performed by Barton A. Holl, the controlling shareholder of Logan and his son, Richard H. Holl, which supervision did not exceed three visits per year.

18. There were no significant changes made in Pennsylvania Division personnel or policy after the merger.

19. John Frantz, a Pennsylvania resident, was the Manager of the Pennsylvania Division during the tax year.

20. During the tax year, Frantz supervised the entire Pennsylvania operations, which encompassed approximately 175 to 180 employees.

21. The only guidelines given to Frantz in conjunction with managing the Pennsylvania Division were "run it like it was your own."

22. Frantz did not receive any substantial supervision regarding the operations during the tax year.

23. There was no assertion of quality control by Ohio Division management to the operations in Pennsylvania.

24. The Ohio Division purchased its workmen's compensation insurance from the State of Ohio.

25. The Ohio Division used the Farmers and Merchants Bank in Logan, Ohio and the City National Bank and Trust Company in Columbus, Ohio for its banking.

26. Except for the original loan payments, none of the funds in the Ohio banks were used to pay the obligations of the Pennsylvania Division.

27. The Ohio Division paid for its own insurance, supplies, and payroll.

28. The Ohio Division had its own invoices headed "Logan Clay Products Company, Logan, Ohio" for its customers.

29. There were no company-wide standards which apply jointly to the entire operations of Logan in Ohio and Pennsylvania.

30. There was no transfer or exchange of equipment between the Ohio and Pennsylvania Divisions.

31. The Pennsylvania Division was not financially dependent upon the Ohio Division.

32. Separate billings were made to each of the divisions for the work performed for each of them.

33. Each of the Pennsylvania plants were responsible for their own accounts receivable, their own invoicing, their own banking, their own payables, and their own general ledger.

34. Each plant in the Pennsylvania Division had separate invoices for its own shipment to customers.

35. The collection of outstanding accounts was handled separately by the Pennsylvania Division.

36. The Pennsylvania Division maintained separate bank accounts. It used the Mellon National Bank and the Merchants National Bank in Kittanning, Pennsylvania. Payments to Logan were made from these accounts from time to time, and such payments were thereafter commingled with Logan's funds in Ohio.

37. The checks drawn on the Pennsylvania Division bank accounts were signed by Pennsylvania personnel in conducting their operations.

38. The record discloses no instance when personnel named on the signature cards, representing the Board of Directors of Logan, signed checks for the Pennsylvania Division.

39. During the tax year, the Pennsylvania Division continued to have separate letterheads and other printed materials.

40. The Pennsylvania Division companies had separate letterheads which indicated that they were operating solely out of Pennsylvania.

41. The Pennsylvania Division had its own insurance which was placed locally.

42. The Pennsylvania Division workmen's compensation was placed with the Pennsylvania Manufacturers' Association.

43. The premiums paid for these Pennsylvania Division insurance policies were paid from the bank account in Pennsylvania.

44. The Pennsylvania Division had certain scientific testing done separate from the Ohio Division. It hired a Pittsburgh testing laboratory, West Penn (Bend) Testing Laboratories, to do this work.

45. The Pennsylvania Division company testing was done by Pennsylvania personnel and was not done by the production personnel from the Ohio Division.

46. The Pennsylvania manager had the right to invest funds.

47. The Pennsylvania Division investments were made by the Pennsylvania manager in United States Treasury Bonds.

48. Securities of Logan were kept for the Ohio Division in Ohio and of the Pennsylvania Division in Pennsylvania.

49. The Pennsylvania Division manager had the right to hire and fire employees of that division.

50. The Pennsylvania Division had Pennsylvania counsel to represent it in its legal affairs.

51. The Pennsylvania manager set prices for the sale of products produced by the Pennsylvania Division, and the prices for the Ohio Division were set by Richard Holl, Vice President of Sales, in Logan.

52. The Pennsylvania Division was operated, as it had been operated before the merger, by local management and personnel.

53. The personnel working in the Pennsylvania Division were not interchanged with those of the Ohio Division.

54. Likewise, none of the Ohio personnel came to Pennsylvania to work in the Pennsylvania Division, except that the Logan auditor audited the Pennsylvania Division books and records periodically.

55. Logan had no company-wide plans for pensions, Blue Cross, Blue Shield, and/or hospitalization insurance. The Pennsylvania Division had its own plans.

56. The Pennsylvania and Ohio Divisions were significantly separate and distinct operations.

57. The Graff and Worthington operations were listed separately without reference to Logan, Ohio in the telephone directory.

58. The Pennsylvania Division paid its own taxes for the year in question.

59. The Federal Income Tax for the Pennsylvania Division was paid from the local Pennsylvania bank account.

60. The securities purchased by the Pennsylvania Division were held in a safe deposit vault in the Mellon National Bank in Kittanning, Pennsylvania.

61. The Pennsylvania payroll returns were prepared and signed by the bookkeeper for the Pennsylvania operation.

62. There was a monetary limit placed on the authority given to Frantz to operate the Pennsylvania Division, but the record does not disclose the amount.

63. Frantz made various operational changes without obtaining approval from Logan in Ohio, including such items as the building of a building, the building of a loading dock, the building of a turning machine, as well as building various equipment for the Pennsylvania Division plant. These decisions were made without contacting any Ohio personnel.

64. The manager of the Pennsylvania Division had authority to make purchases in excess of $100,000.

65. The manager of the Pennsylvania Division had complete control over the acceptance of customers and credit matters relating to them.

66. The Pennsylvania manager had control over his expense account and those of his employees. These were not audited individually by the Ohio Division personnel, but were part of the periodic overall audit by Logan.

67. The salesmen for the Pennsylvania Division reported to the Pennsylvania Division Manager, and looked to him for direction, supervision, and increases in compensation. The Pennsylvania Division salesmen covered Pennsylvania and states eastward, viz., Pennsylvania, New York, New Jersey, Maryland, Massachusetts, Connecticut and Maine. They did not sell or solicit orders west of Pennsylvania. The Pennsylvania Division hired all of its own salesmen. Reports concerning sales by the Pennsylvania Division salesmen were made directly to Frantz.

68. The decision regarding the distribution of the profits resulting from the Pennsylvania Division operation initially would be made by Frantz.

69. Purchases of marketable securities were made by the respective managers of each division.

70. The Ohio Division has a new and modern plant, emphasizing the use of modern manufacturing tech-

niques. It has been improved to stay abreast of the industry.

71. The testing of the Ohio clays for the making of the products in the Ohio Division was done by Barton S. Holl in Ohio.

72. The Ohio Division has a separate manager who is in charge of its production and quality control.

73. The Ohio operations manager does not become involved with the operational problems of the Pennsylvania Division.

74. The Ohio plant uses clay reserves located in Ohio only. These reserves are approximately five or six miles from the plant.

75. The Pennsylvania Division plants are antiquated in their facilities and operations.

76. The Ohio Division employed eight or nine salesmen ("Ohio Salesmen") to sell its products.

77. With rare exception the Ohio Division did not sell any of the products manufactured by Worthington, such as drain tile, hollow tile and flue liners.

78. The Ohio Division did not manufacture flue liners.

79. Except for rare occasions, in order to meet an accommodation sale, the Ohio Division did not sell the sewer pipe manufactured by Graff; such accommodation sales were less than one percent (1%) of the total sales for the Ohio Division. The only Pennsylvania Division sales made of Ohio products were a few accommodation sales; these accommodation sales at most amounted to 2½ percent of the total Pennsylvania Division sales involved.

80. There were approximately $30,000 worth of accommodation interchange sales made between the two divisions during the tax year. This was less than one percent (1%) of the total sales.

81. None of the Ohio Division employees worked in the Pennsylvania Division plants or in their manufacturing operations.

82. Separate sales meetings were held and separate sales instructions were given for sales people for each of the two divisions.

83. The customers for the Ohio Division's territory require an unglazed product made to approval specifications. This product would not be accepted by Pennsylvania customers. The building supply dealers in the Pittsburgh area demanded a glazed sewer pipe. They would refuse an unglazed product because such products would not be acceptable to their customers. At one time the Pennsylvania Division attempted to market an unglazed product. However, it had to revert back to manufacturing a glazed sewer pipe due to customer pressure.

84. The customers for the Pennsylvania Division market are dealers (mainly lumber dealers and building supply dealers for use by individuals and plumbers) who are different from the type of contractors and dealers who buy from the Ohio Division.

85. The Ohio Division used separate trade and selling brochures for the sale of its product line. It advertised its product line separately and without reference to the Pennsylvania Division and its products.

86. With rare exception, each division was separately listed in trade purchasing directories for purposes of advising customers.

87. The Ohio Division manufactures many different type of sewer pipe which were not made by the Pennsylvania Division.

88. Ninety percent of the Ohio Division's production consisted of the manufacture of sewer pipe.

89. The Ohio Division's unglazed sewer pipe was made using a mixture of approximately 50 percent fire clay and 50 percent shale. This is different from the mixture used in manufacturing the sewer pipe in Pennsylvania.

90. The sewer pipe manufactured by the Ohio Division does not appear to be the same product as that manufactured in Pennsylvania. The Ohio pipe is a dull, light reddish-brown color. The clay sewer pipe manufactured at the Graff plant is "salt glazed," which gives the product a shiny, dark brownish-red appearance. Drain tile manufactured by the Pennsylvania Division was not manufactured by the Ohio Division.

91. The Ohio Division made a reduced diameter pipe, which was not generally interchangeable with products manufactured by the Pennsylvania Division. The Pennsylvania Division made only full dimension pipe.

92. The Ohio Division had separate brochures for its products, these brochures being listed under the name of Logan. The Pennsylvania Division had separate brochures for its products, some of which were listed under the names of "Graff-Kittanning" and "Worthington."

93. The Ohio Division manufactured chemi-drain tile. This product was not made or sold by the Pennsylvania Division.

94. The Ohio Division did not interchange its products with those manufactured by the Pennsylvania Division.

95. All of the raw materials used in the manufacturing processes of the Pennsylvania Division were controlled by the Pennsylvania Division and came from Pennsylvania.

96. The Pennsylvania Division was a member of the Eastern Clay Drain Tile Association, a trade association. The Ohio Division did not belong to this trade association.

97. The Pennsylvania Division was not dependent on products manufactured by the Ohio Division.

98. The Pennsylvania Division produced a profit before Federal Income Tax of $45,433.96, and the Ohio

Division generated a profit of $419,994.27, for the fiscal year ending November 30, 1964.

99. The percent of profit divided between the two divisions was as follows: (a) Pennsylvania Division profit—9.76 percent, (b) the Ohio Division profit—90.24 percent.

100. The Pennsylvania Division's taxable federal net income for the year of 1964 amounted to $24,176.28.

101. The Ohio Division's taxable federal net income for the tax year amounted to $227,924.77.

102. The combined company taxable federal net income for the tax year was $252,101.05.

103. The taxable net income using the Pennsylvania Corporate Net income allocation formula which treats Logan's business as *unitary*, resulted in attribution of income to the Pennsylvania Division in the amount of $137,667.00. This allocated 32.88 percent of Logan's taxable net income to Pennsylvania and 67.12 percent to Ohio.

104. For the tax year, the gross income of the Pennsylvania Division was $1,524,647.50. The gross income of the Ohio Division was $3,787,092.25 for the same year.

105. The labor costs resulting from the Pennsylvania Division operations were $851,370.26, and the labor costs for the Ohio Division operations were $1,100,485.15.

106. It was stipulated at trial that if this Court holds the Logan operations to be multiform, the computations shown on Logan's filed Pennsylvania Corporate Net Income tax return are correct.

## DISCUSSION

As we stated at the beginning, the issue confronting us is whether the income generated by Logan's multi-state operation should be included in the formula computation used in determining Logan's Corporate

Net Income Tax owed to the Commonwealth for the tax year. The statute involved is paragraph 1(b) of Section 2 of the Corporate Net Income Tax Act,[1] Act of May 16, 1935, P.L. 208, 72 P.S. §3420b 2.(c)(3) (hereinafter CNI Tax Act), which reads in pertinent part: "Where a corporation in any tax year beginning on or after the first day of January, one thousand nine hundred fifty-six, engages in a separate business outside of Pennsylvania, or owns property having a situs outside of Pennsylvania, which business or property bears no relation to the exercise of the Pennsylvania franchise, the department, with the approval of the Auditor General, may determine the base for the tax imposed by this act for the tax year by excluding from the net income of such corporation as returned to and ascertained by the Federal Government, the net income from the business or property which bears no relation to the exercise of the Pennsylvania franchise."

The Commonwealth contends that Logan has not met its burden of proving that it was entitled to a multi-form tax settlement for the tax year. It argues that Logan's operation was unitary because both the Pennsylvania and Ohio Divisions of Logan were engaged in the business of producing and selling "clay products." Logan counters this argument by contending that the two divisions were operated independent of each other and that although they sold similar products, they were completely different operations and thereby multiform. Under the CNI Tax Act, in a multiform situation, exclusion of out-of-state income was permitted where the taxpayer had been engaged in a separate business outside of Pennsylvania. *See Commonwealth v. ACF Industries, Incorporated*, 441 Pa. 129, 271 A. 2d 273

---

[1] This statute was later repealed by the Tax Reform Code of 1971, Act of March 4, 1971, P.L.      , art. IV, §401, as amended, 72 P.S. §7401.

(1970); *Morewood Realty Corporation v. Commonwealth*, 6 Pa. Commonwealth Ct. 244, 294 A. 2d 219 (1972).

The current state of the law concerning what is "multiform" has been set forth by our Supreme Court in *Commonwealth v. ACF Industries, Incorporated, supra.* In that case Mr. Justice COHEN described the multiform concept as an attempt to avoid an impermissible taxation of income by Pennsylvania and an effort to insure that the allocation of taxable value to Pennsylvania bears a fair relation to the amount of local business done by the corporation within the Commonwealth. He delineated the principles to be applied in a multiform situation as follows:

"First, if a multistate business enterprise is conducted in a way that one, some or all of the business operations outside Pennsylvania are independent of and do not contribute to the business operations within this State, the factors attributable to the outside activity may be excluded.

"Second, in applying the foregoing principle to a particular case, we must focus upon the relationship between the Pennsylvania activity and the outside one, not the common relationships between these and the central corporate structure. Only if the impact of the latter on the operating units or activities is so pervasive as to negate any claim that they function independently from each other do we deny exclusion in this contest.

"Third, without attempting to preclude exclusion in any given case, we reiterate our statement above that the manufacturing, wholesaling and retailing (or manufacturing and selling) activities of a single enterprise are not fit subjects for division or partial exclusion. On the other hand, a truly divisionalized business, conducting disparate activities with each division internally integrated with respect to manufacturing and selling,

may well be in a position to make a valid claim for exclusion." 441 Pa. at 142-143, 271 A. 2d at 280.

We also must note that "the burden is on the taxpayer to show by clear and cogent evidence that the taxing formula resulted in extraterritorial values being taxed." *Commonwealth v. American Telephone and Telegraph Company,* 382 Pa. 509, 516, n.2, 115 A. 2d 373, 376 n.2 (1955); *also see Commonwealth v. Emhart Corporation,* 443 Pa. 397, 278 A. 2d 916 (1971). Furthermore, "[t]he proper standard to be utilized in evaluating whether a taxpayer has satisfied his burden as to an unrelated asset is to determine if there is clear evidence that the asset is not ' "a necessary part of the corporate activity" '. Commonwealth v. The Mundy Corporation, 346 Pa. 482, 484, 30 A. 2d 878, 879 (1943). . . ." *Commonwealth v. Emhart Corporation,* 443 Pa. at 404, 278 A. 2d at 919.[2]

In most of the cases where the courts have held the business activity to be multiform, the facts of the cases disclosed a definitive difference between the out of state operation and the operation within the Commonwealth. For example, in *Commonwealth v. Baker Whiteley Coal Company,* 74 Pa. D. & C. 13 (1950), the court easily distinguished the difference between a tugboat operation and the mining of coal. In *Commonwealth v. The Mundy Corporation, supra,* the Court distinguished between the taxpayer's real estate bus-

---

[2] The Pennsylvania Supreme Court has held that both the Corporate Net Income Tax and the Franchise Tax utilize the same principles in determining the tax liability based upon the taxpayer's activities within and without the Commonwealth of Pennsylvania. In *Commonwealth v. ACF Industries, Incorporated, supra,* the Court said: "Actually these two questions are the same, the goal being to tax a proportion of value or income reflecting the value of the Pennsylvania Franchise." 441 Pa. at 134, 271 A. 2d at 276. *See also Commonwealth v. American Telephone and Telegraph Company, supra.*

iness and its investment in securities. In *Advance-Wilson Industries, Inc. v. Commonwealth*, 7 Pa. Commonwealth Ct. 14, 297 A. 2d 835 (1972), this Court distinguished the manufacture and sale of ceramic tile with another operation involving the plating of parts and tools by an electrolyzing process.

The facts of this case as found by this Court present a much closer question when comparing Logan's business interests in Ohio and Pennsylvania. It is true, as the Commonwealth contends, that both the Ohio Division and Pennsylvania Division were involved in the production and sale of clay products. However, when the principles set forth in *Commonwealth v. ACF Industries, Incorporated, supra*, are applied, we conclude that the two operations were independent of each other and neither contributed to the business operation of the other during the tax year in issue. We further conclude that the Ohio Division did not contribute to the business operations of the Pennsylvania Division. According to our Findings of Fact, the Pennsylvania Division did not rely on the Ohio Division for anything other than rather cursory or superficial visits by Logan officials and the annual audit, both of which are de minimis and fail to establish any interdependence.

The real test in this case is whether Logan's business activity in Ohio contributed to or was related to or was an integral part of the business activity of the Pennsylvania Division. In other words, did the Ohio Division business operation contribute to the exercise of the franchise of Logan in Pennsylvania? From our Findings of Fact, we conclude that there was no reasonable relationship between the Ohio Division, which was sought to be included within the tax formula by the Commonwealth, and the Pennsylvania Division. In other words, Logan's Ohio Division activities neither enhanced nor diminished its business activities in Pennsylvania. *See Commonwealth v. Kirby Estates, Inc.*,

432 Pa. 103, 246 A. 2d 120 (1968). In *Commonwealth v. L. D. Caulk Co.,* 11 Pa. D. & C. 2d 218 (1956), the court stated: "Multiformity in business activity exists where two separate and segregated enterprises are not related to each other and are conducted as separate and independent units, and the corporation derives benefits from each independent unit that are not related to the operation of the other units." 11 Pa. D. & C. 2d at 223.

### CONCLUSIONS OF LAW

1. For Pennsylvania Corporate Net Income Tax purposes in the tax year ending November 30, 1964, Logan was engaged in two separate and unrelated businesses.

2. Although both the Pennsylvania and the Ohio Divisions of Logan were involved in the business of producing clay products, the type of clay products produced by each division were significantly different and were not interchangeable to any substantial degree. Therefore, the business operation of the Ohio Division did not contribute to the business operation of the Pennsylvania Division.

3. There was no interrelationship between the business operation of the Ohio and the Pennsylvania Division thereby negating any connection between the business operation of the Ohio Division and the privilege granted by Pennsylvania to conduct business in this Commonwealth.

4. Logan has met its burden of proving that it is entitled to a multiform tax settlement for the tax year ending November 30, 1964.

5. The Commonwealth may not include Logan's entire taxable income derived in all states in arriving at a settlement of Logan's Corporate Net Income Tax for the tax year in issue.

Accordingly, we issue the following

## ORDER

And now, this 28th day of January, 1974, the appeal of Logan Clay Products Company from the decision of the Board of Finance and Revenue denying Logan's petition for resettlement of its Pennsylvania Corporate Net Income Tax for the fiscal year ending November 30, 1964, is sustained; and unless exceptions be filed to this Order within thirty days hereof, it is ordered that judgment be entered in favor of the Commonwealth and against Logan Clay Products in the amount of $1,614.45, together with interest and costs which shall be paid accordingly and with a credit allowed to the said company for such amount, if any, as it has paid on such tax obligation. The Prothonotary is directed to notify forthwith the parties hereto or their counsel of this Order by personal service or by U. S. registered mail.

---

DISSENTING OPINION BY PRESIDENT JUDGE BOWMAN:

I respectfully dissent. In my opinion, the majority view will permit any corporation doing business in Pennsylvania and elsewhere, by the simple expedient of a change in operational structure, to substantially reduce its Pennsylvania corporate tax liability because it thereby engages in the so-called multiform business activity. Thus, the ultimate premium is given to form over substance and would appear to also be the ultimate extension of a judicially created theory of exclusion from the Pennsylvania tax base of so-called unrelated assets or outside of Pennsylvania business activity if conducted under a multiform concept.

As noted in *Commonwealth v. ACF Industries, Inc.*, 441 Pa. 129, 271 A. 2d 273 (1970), the *fons et origo* of this judicially created concept is *Commonwealth v. Columbia Gas and Electric Corporation*, 336 Pa. 209, 8 A.2d 404 (1939). In *ACF Industries*, in which it was held that an isolated investment by corporate taxpayer

in the stock of another corporation to be an unrelated asset, the Supreme Court undertakes a review of the case law developed to date and then concludes that three correlated principles have emerged. These are set forth in the majority opinion and will not be repeated here. However, in my opinion, the majority has given insufficient weight to the third principle announced in *ACF Industries* that a ". . . truly divisionalized business, *conducting disparate activities* with each division internally integrated with respect to manufacturing and selling, may well be in a position to make a valid claim for exclusion." In my opinion, taxpayer here has fallen far short of showing disparate activities in Pennsylvania and Ohio with respect to the manufacture and sale of clay products in both states. That clay products are glazed in their manufacture in one state and not in the other cannot serve to establish disparate activities in the two states.

Whatever justification this judicially created theory may have enjoyed in its origin, particularly as to unrelated assets, its continued expansion and broadening, unless reexamined or limited to its present scope, will play a greater role in Pennsylvania corporate taxation than the allocation and apportionment provisions of the applicable statutory law which are specifically designed to measure the Pennsylvania business activity of corporations doing business here and elsewhere.

Judge ROGERS joins in this dissent.