## Carheart Corporation *v*. Commonwealth.

Argued December 7, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER and ROGERS.

*William P. Thorn,* with him *Wolf, Block, Schorr* and *Solis-Cohen,* for appellant.

*George W. Keitel,* Deputy Attorney General, for appellee.

OPINION BY JUDGE KRAMER, April 6, 1972:

This is an appeal by the Carheart Corporation (Carheart) from a determination of the Board of Finance and Revenue (Board), refusing Carheart's petition for a review of the Board's prior refusal of a petition for resettlement. The Board thereby sustained the action of the Department of Revenue and the Auditor General in the settlement of the franchise tax liability of Carheart for the year 1958.

In accordance with Section 14 of the Fiscal Code, Act of July 13, 1957, P. L. 838, Section 1104, 72 P.S. §1104, appeal was timely taken on July 28, 1961, to the Court of Common Pleas of Dauphin County sitting as the Commonwealth Court. Following the creation of this Court under and by virtue of the Commonwealth

Court Act, Act of January 6, 1970, P. L. (Act No. 185, 1969), 17 P.S. §211.1, et seq., this case was trans-ferred to this Court in 1970. After correspondence by this Court with counsel for the Commonwealth of Pennsylvania and Carheart, the parties hereto filed a stipulation of facts on October 6, 1971, which dispensed with the necessity for a trial by jury under the provisions of the Act of April 22, 1874, P. L. 109, 12 P.S. §688. After the submission of briefs and oral argument, the matter is now ripe for determination by this Court.

## FINDINGS OF FACT

The stipulation of facts filed by the parties is adopted substantially as the Findings of Fact by the Court. They are as follows:

1. Carheart Corporation (Carheart) was incorporated on January 20, 1933, pursuant to the provisions of an act of the Legislature of the State of Delaware, entitled "An Act providing a general corporation law" (approved March 10, 1899) and the acts amendatory thereto.

2. Carheart's Pennsylvania franchise and corporate net income tax report for the year 1958 was filed timely.

3. On May 11, 1960, a copy of the settlement of Carheart's franchise tax report by the Department of Revenue and the Auditor General was mailed to Carheart.

4. This settlement valued Carheart's capital stock at $1,000,000.00.

5. The taxable proportion was settled at 71.5066%, the same as reported by Carheart on its tax return.

6. Carheart filed a Petition for Resettlement with the Secretary of Revenue and the Auditor General on June 8, 1960.

7. Carheart's Petition for Resettlement was refused by a notice mailed November 28, 1960.

8. Carheart filed a Petition to Review this refusal of resettlement with the Board of Finance and Revenue on January 25, 1961.

9. By an order mailed June 2, 1961, the Board of Finance and Revenue refused Carheart's Petition for Review and sustained the action of the Department of Revenue and the Auditor General.

10. The valuation of Carheart's stock for franchise tax purposes used by the Commonwealth included the value of stock of The Meadville Corporation ("Meadville") owned by Carheart which was excluded by Carheart in its valuation on its return as filed.

11. The purposes of Carheart as stated in its Certificate of Incorporation are, *inter alia,* as follows:

"To acquire by purchase, subscription or otherwise, hold, own, sell, mortgage, pledge and otherwise dispose of, exchange, transfer, assign, deal in and with stocks, bonds, mortgages, debentures, obligations, evidences of indebtedness and securities issued by any public or private corporation, government or municipality, domestic and foreign or otherwise; to exercise and enjoy all the rights, powers and privileges of ownership of all shares of stock, bonds, mortgages, debentures, evidences of indebtedness and choses in action at any time, held or acquired by it, including the right to vote, collect and dispose of dividends on said shares of stock, and to enforce, collect, receive and dispose of the interest and principal of all such bonds, mortgages, debentures and evidences of indebtedness and choses in action.

"To buy, sell, exchange, lease and otherwise acquire, hold, own, maintain, control, work, develop, improve, alter, operate, mortgage, let, rent, convey, deal in and otherwise turn to account, real estate, chattels and personal property of every class and description.

. . . .

"To inform, promote, organize, reorganize, liquidate, underwrite, finance, manage and operate the properties

or business of any and all corporations, firms, partnerships or individuals and to give any guarantee in connection therewith or otherwise for the payment of money or for the performance of any obligation or undertaking.

"To carry on and undertake any business undertaking, transaction or operation commonly carried on or undertaken by capitalists, underwriters, promoters, financers, contractors, merchants, commission men and agents, and in the course of such business to draw, accept, acquire and sell all or any negotiable or transferable instruments and securities, including debentures, bonds and notes.

. . . .

"To manufacture, purchase or otherwise acquire goods, wares, merchandise and personal property of every class and description, and hold, own, mortgage, sell or otherwise dispose of, trade, deal in and deal with the same.

"To acquire and undertake the good-will, property, rights, franchises, contracts and assets of every manner and kind and the liabilities of any person, firm, association or corporation, either wholly or in part, and pay for the same in cash, stock or bonds of the corporation or otherwise.

. . . .

"To hold, purchase, or otherwise acquire, sell, assign, transfer, mortgage, pledge or otherwise dispose of shares of the capital stock and bonds, debentures or other evidences of indebtedness created by any corporation or corporations, and, while the holder thereof, exercise all the rights and privileges of ownership, including the right to vote thereon.

. . . .

"To conduct business in the State of Delaware and elsewhere, including any of the states, territories, colo-

nies or dependencies of the United States, the District of Columbia and any and all foreign countries, have one or more offices therein, and therein to hold, purchase, let, mortgage and convey real and personal property, except as and when forbidden by local law.

"With a view to the working and development of the properties of the corporation, and to effectuate, directly or indirectly, its objects and purposes, or any of them, the corporation may, in the discretion of the Directors, from time to time carry on any other lawful business, manufacturing or otherwise, to any extent and in any manner not unlawful.

.   .   .   .

"The objects and purposes specified in the foregoing clauses shall, except where otherwise expressed, be in nowise limited or restricted by reference to, or inference from, the terms of any other clause in this Certificate of Incorporation, but the objects and purposes specified in each of the foregoing clauses of this article shall be regarded as independent objects and purposes."

12.   Carheart's statutory office in the State of Delaware during 1958 was 927 Market Street Wilmington, and its statutory agent in Delaware was Corporation Guarantee and Trust Company.

13.   On October 2, 1933, Carheart was issued a Certificate of Authority to do business in Pennsylvania under the provisions of Article X of the "Business Corporation Law" (Act No. 106) approved May 5, 1933.

14.   The purpose clause of the Pennsylvania Certificate of Authority reads as follows: ". . . grant unto such corporation a Certificate of Authority, to transact in the Commonwealth of Pennsylvania the business of to buy, sell and generally deal in and with real estate and to acquire, purchase, own, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of and deal in stocks, bonds, mortgages, securities, notes and commercial papers."

15. Carheart's registered office in Pennsylvania during 1958 was 61 Raynham Road, Merion, Pennsylvania.

16. 61 Raynham Road, Merion, Pennsylvania was the home of Max Levinson until 1952. In that year he sold this house and moved to 1510 Van Buren Street, Hollywood, Florida.

17. Through inadvertence the registered office of Carheart in Pennsylvania was not changed after Mr. Levinson moved from that address.

18. Carheart's total outstanding stock consists of 200 shares no par value common stock owned as follows:

| | | |
|---|---|---|
| Max Levinson | 120 | shares |
| Ralph Levinson, Joseph J. Gabel and Joel Claster, Trustees under agreement of inter vivos trust for Arthur Levinson | 26-2/3 | shares |
| Ralph Levinson, Joseph J. Gabel and Joel Claster, Trustees under agreement of inter vivos trust for Carl Levinson | 26-2/3 | shares |
| Ralph Levinson, Joseph J. Gabel and Joel Claster, Trustees under agreement of inter vivos trust for Helen Levinson Doroshow | 26-2/3 | shares |
| | 200 | shares |

19. The tax returns of the trusts are filed in Jacksonville, Florida, showing the address of Joseph J. Gabel, Trustee, Hollywood, Florida.

20. During 1958 Carheart's directors were Max Levinson, Ralph Levinson and Morton Sand.

21. Carheart's officers are:

President: Max Levinson

Vice President: Morton Sand

Secretary: Morton Sand

Treasurer: Max Levinson

22.   Max Levinson resides at 1510 Van Buren Street, Hollywood, Florida.

23.   Ralph Levinson resides at 1509 Hampden Boulevard, Reading, Pennsylvania.

24.   Morton Sand resides at 709 Arlington Road, Penn Valley, Narberth, Pennsylvania.

25.   At December 31, 1958, Carheart's assets and liabilities were as follows: (all assets at cost; cents omitted)

### ASSETS

| | | |
|---|---:|---:|
| Cash in bank | | $      8,407 |
| Accounts Receivable | | 708 |
| Prepayments | | 13,026 |
| Meadville stock | | 27,500 |
| Land | | 648,284 |
| Buildings | 1,017,415 | |
|    Res. for Dep. | 305,796 | 711,619 |
| Equipment & Fixtures | 2,000 | |
|    Res. for Dep. | 283 | 1,717 |
| Total Assets | | $1,411,261 |

### LIABILITIES AND CAPITAL

| | | |
|---|---:|---:|
| Accounts Payable | | $     30,950 |
| Accrued Interest | | 785 |
| Accrued Taxes | | 2,557 |
| Securities Deposits | | 200 |
| Mortgages Payable | | 226,814 |
| Notes Payable | | 638,000 |
| Total Liabilities | | $  899,306 |
| Capital Stock | | 20,000 |

| | |
|---|---:|
| Capital Surplus | 59,167 |
| Earned Surplus | 432,788 |
| | |
| Total Capital and Surplus | $ 511,955 |
| Total Liabilities and Capital | $1,411,261 |

26. The cost of land, buildings, equipment and fixtures owned by Carheart at December 31, 1958 and reflected in the above list of assets is as follows:

| Location | Type of Property | Land | Buildings and Improvements, Equipment & Fixtures |
|---|---|---:|---:|
| PHILADELPHIA, PENNSYLVANIA | | | |
| 900 S. 11th St. | Gasoline Station | 10,127.50 | 2,402.83 |
| 2500 Frankford Ave. | Gasoline Station | 6,659.75 | 3,066.75 |
| 4650 Frankford Ave. | Stores | (135,171.55 ( | 416,000.00 182,611.59 (b) |
| 5234 Market St. | Store | 20,298.25 | 15,000.00 |
| 5534 N. 5th St. | Stores and Apartment | 20,046.00 | 17,000.00 |
| 5614 N. 5th St. | Stores | 96,419.36 | 150,000.00 |
| 62-66 W. Chelten Ave. | Stores | 61,695.50 | 125,000.00 |
| 20th and Market Sts. | Parking Lot (d) | 163,064.50 | |
| TOTAL—PENNSYLVANIA | | 513,482.41 | 911,081.17 |
| CAMDEN, N. J. | | | |
| 2-16 S. Broadway | Stores & Offices (c) | 134,801.63 | 108,333.33 |
| TOTAL—ALL LOCATIONS | | 648,284.04 | 1,019,414.50 |

NOTES:
  (b) Improvements
  (c) Represents one-third (1/3) undivided interest.
  (d) Represents one-half (1/2) undivided interest.

27. All purchases, sales and leases relating to Carheart's Pennsylvania real estate were handled in Pennsylvania by representatives, officers or agents of Carheart.

28. Carheart's income and expenses for the calendar year 1958 were as follows:

### INCOME

| | |
|---|---:|
| Rents | $143,893.76 |
| Dividends from Meadville | 41,250.00 |
| Interest | 16.63 |
| | $185,160.39 |

### EXPENSES

| | |
|---|---:|
| Rents | 266.64 |
| Repairs | 3,039.37 |
| Interest | 27,754.04 |
| Taxes | 47,719.98 |
| Depreciation | 46,025.20 |
| Other Expenses | 16,771.29 |
| | $141,576.52 |

| | |
|---|---:|
| Net Income (before Federal Income Taxes) | $ 43,583.87 |

29. Carheart acquired its stock in Meadville on January 20, 1933.

30. Carheart originally acquired 275 shares of $100 par value stock of Meadville by purchase from Meadville at $100 per share. This stock was subsequently exchanged in a reorganization for 27,500 shares of new stock with a $1.00 par value.

31. At the end of 1958 Carheart still held these 27,500 shares of Meadville stock, never having bought, sold, pledged or encumbered any stock except as specified in the following paragraphs.

32. On December 31, 1958, Carheart pledged a total of 10,000 shares of its Meadville stock to Trustees under six irrevocable trusts created by Max Levinson and his wife, Anna Bessie Levinson, for the benefit of their children to secure loans made at various times by the trust to Carheart in the aggregate amount of $438,000. The six notes and pledge agreements were signed by

the President in Florida and by the Secretary in Philadelphia.

33. This pledge was made solely because of advice of counsel that the continuation of unsecured loans by the trusts to Carheart would result in a substantial risk of the income of the trusts being taxed to Max and Anna Bessie Levinson pursuant to Section 675(3) of the Internal Revenue Code of 1954. That Section provides that the grantor of a trust is treated as the owner of any portion of the trust if the grantor has directly or indirectly borrowed (and presumably this included loans to a corporation controlled by the grantor or a member of his family) any amounts from the trust. The Section does provide an exception if the loans are secured by adequate security, but the credit of the borrower is not considered adequate security.

34. The loans from the trust were repaid during 1960 and 1961 and the Meadville stock was released by the trusts from the pledge. Payment was made by checks mailed or delivered to 2227 Bryn Mawr Avenue.

35. At August 31, 1958, the end of Meadville's fiscal year, Meadville had 207,900 shares of $1.00 par value common stock outstanding.

36. Meadville is engaged by itself and through subsidiaries in the purchase, distribution and sale at retail and wholesale of petroleum products.

37. Meadville does not do business in Pennsylvania.

38. During 1933 Carheart acquired, in addition to Meadville stock, stock of Peerless Oil of Scranton and Peerless Holding Company.

39. The stock in Peerless Holding Company (a real estate holding company) was purchased from Max Levinson in 1933 for $20,000. Carheart subsequently contributed $55,000 to the capital of Peerless Holding Co. This stock was sold in 1936 to Anna Bessie Levinson, the wife of Max Levinson, for $82,500. Settlement took place in Philadelphia.

40. The stock of Peerless Oil of Scranton which had been acquired for $50,666.67 was sold in 1946 to Richfield Oil Corp., of New York, a corporation unrelated to Meadville or Carheart, for $146,254.22.

41. In 1946 Carheart made an investment in Carheart Sales Corporation of $6,000. This corporation was liquidated in 1949 and Carheart received $4,305 on liquidation.

42. All correspondence and documents concerning the securities transactions referred to in paragraphs 29 through 41 above concerning Carheart were sent to and from Carheart in Pennsylvania.

43. Through the end of 1958, Carheart had never owned any securities other than those mentioned above and had owned no securities other than Meadville stock since 1949.

44. The stock of Meadville, Peerless Holding Company and Peerless Oil of Scranton is not publicly held and is not traded on any stock exchange or in the over-the-counter market.

45. There is no corporate relationship between Carheart, Meadville, Peerless Holding Company or Peerless Oil of Scranton other than the ownership by Carheart of 27,500 shares of Meadville stock.

46. No meeting of Carheart's stockholders was held during 1958.

47. Only one meeting of Carheart's directors was held during 1958, and that was at 1510 Van Buren Street, Hollywood, Florida.

48. The directors' meeting held during 1958 was for the purpose of considering an offer that had been made to Carheart to purchase a portion of its stock in Meadville. That offer was sent to Carheart at 2227 Bryn Mawr Avenue, Philadelphia, Pennsylvania 19131.

49. Carheart's directors decided not to sell any of its Meadville stock at that time.

50. Carheart's bank account is maintained at Philadelphia National Bank, Philadelphia, Pennsylvania.

51. Philadelphia National Bank sends Carheart's bank statements to 2227 Bryn Mawr Avenue, Philadelphia, Pennsylvania 19131.

52. 2227 Bryn Mawr Avenue is a building owned by United Petroleum Corporation, a subsidiary of Meadville.

53. During 1958 rents on real estate owned by Carheart were collected by real estate agents, primarily Strouse, Greenberg & Company, Philadelphia, Pennsylvania, and remitted by them to 2227 Bryn Mawr Avenue, Philadelphia, Pennsylvania 19131, from where they were deposited in Carheart's bank account.

54. Dividend checks on Meadville stock are sent to Carheart at 2227 Bryn Mawr Avenue, Philadelphia, Pennsylvania 19131, from where they were deposited in Carheart's bank account.

55. Verbal authority was given by Max Levinson to Meadville to deliver dividend checks to 2227 Bryn Mawr Avenue, Philadelphia, Pennsylvania 19131.

56. Bank deposits are prepared by Max Levinson personally when he is in Philadelphia, and when he is out of Philadelphia, by Betty Knapp, a bookkeeper employed by United Petroleum Corp. at the office at 2227 Bryn Mawr Avenue, Philadelphia, Pennsylvania 19131. A duplicate bank deposit slip is either mailed to Max Levinson in Florida by Betty Knapp or taken to Florida by Max Levinson if he prepared the deposit when he is in Philadelphia. A triplicate bank deposit slip is kept in Philadelphia to insure against loss. No bookkeeping entries or other records of bank deposits are made in Philadelphia.

57. Financial records have never been regularly maintained at 2227 Bryn Mawr Avenue, Philadelphia, Pennsylvania 19131 for Carheart.

58. Checks of Carheart are prepared and signed by Max Levinson personally at his home in Florida or at 2227 Bryn Mawr Avenue when he is in Philadelphia. Max Levinson records the payment in the check book.

59. During 1958 deposit slips and bank statements were picked up at 2227 Bryn Mawr Avenue by Carheart's accountants, N. Tannenbaum & Co., and taken back to their office at 570 Seventh Avenue, New York, New York, for entry in Carheart's financial books and records.

60. Carheart's financial books and records consisted of a cash receipts book, a cash disbursements book, a general journal and a general ledger. They were prepared by Carheart's accountants from deposit slips and bank statements and were maintained at Room 1808, 570 Seventh Avenue, New York, New York, the office of Carheart's accountants. No books and records are maintained in Philadelphia, except for the triplicate deposit slips referred to in Paragraph 56.

61. Carheart has never been registered to do business in New York State.

62. Carheart's tax returns are prepared by Carheart's accountants, N. Tannenbaum & Co., in New York and are signed by Max Levinson.

63. Carheart's address used on its tax returns is 570 Seventh Avenue, New York, New York 10018.

64. Carheart keeps its Meadville stock certificates in a safe deposit box owned by Max Levinson at The First Pennsylvania Banking and Trust Company, 54th and City Line Avenues, Philadelphia, Pennsylvania.

65. The records of The First Pennsylvania Banking and Trust Company list Max Levinson's address, for purposes of the safe deposit box, at 2227 Bryn Mawr Avenue, Philadelphia, Pennsylvania.

66. Carheart had been authorized to do business in New Jersey during 1949 and this authorization is still

in effect. The character of business which Carheart is authorized to transact in New Jersey is "to buy, sell and deal in (as principal and not as agent or broker) and with real estate and to acquire, purchase, own, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of and deal in stock, bonds, mortgages, securities, notes and commercial paper; to own, lease and operate business properties."

67. Carheart's statutory office in New Jersey during 1958 was 272 Westfield Avenue, Elizabeth, New Jersey.

68. 272 Westfield Avenue, Elizabeth, New Jersey, was an office leased by Regal Oil Company, which is a subsidiary of Meadville.

69. Tax returns were filed by Corporation during 1958 in New Jersey in addition to Pennsylvania.

70. In 1960 Carheart was required, for the first time, to file a Delaware income tax return.

71. Carheart has not registered to do business in any state other than Pennsylvania or New Jersey.

72. The Meadville stock owned by Carheart and the other securities described above previously owned by Carheart are unrelated to the real estate investments of Carheart and the real estate business carried on by Carheart. The real estate activities of Carheart would have been carried on substantially unchanged if it had never owned any of these securities.

73. Dividends from the Meadville stock become part of the general assets of Carheart and are used for the payment of corporate expenses.

74. In the event that the Franchise Tax settlement against Carheart for 1958 should be sustained by the Court, judgment should be entered in favor of the Commonwealth in the principal amount of $3,575.33, less credit for payment by Carheart in the amount of $3,-343.74, together with interest on the unpaid debit balance of $231.59.

75. In the event that the Court should sustain the appeal of Carheart, judgment should be entered in favor of the Commonwealth in the amount of $1,732.09, which amount having been paid, said judgment shall be marked satisfied, and a credit of $1,611.65 entered on the records of the Department of Revenue.

## DISCUSSION

The narrow question presented to this Court is whether the Meadville stock bears sufficient relation to Carheart's business activities in Pennsylvania, so as to require the inclusion of the value of the Meadville stock in the formula as a Pennsylvania-related valuation under which Carheart would have its franchise tax computed for the taxable year of 1958. The Board in effect approved the inclusion of the Meadville stock as Pennsylvania-related, which resulted in an increase in the franchise tax for the taxable year, over that which Carheart had computed in its tax return.

The relevant taxing statute involved is the Act of June 1, 1889, P. L. 420, as amended,* 72 P.S. §1871(b). This statute requires, *inter alia,* every foreign corporation to pay: ". . . a franchise tax at the rate of five mills . . . upon a taxable value to be determined in the following manner. The actual value of its whole capital stock of all kinds . . . shall be ascertained . . . and shall then be divided into three equal parts." The three equal parts are used in a fractional formula, under which they are designed to be "measures of corporate activity in the taxing state." (*See Commonwealth v. Koppers Company, Inc.,* 397 Pa. 523, 531, 156 A. 2d 328, 333 (1959).)

In determining what portion of the taxpayer's capital stock evaluation should be made applicable to its

---

* The last effective amendment applicable to this case is found in the Act of March 15, 1956, P. L. 1285.

Pennsylvania operations for Pennsylvania franchise tax purposes, a review of the decisional law of this Commonwealth is appropriate.

We are aided somewhat in our analysis by virtue of the fact that the Pennsylvania Supreme Court has held that both the corporate net income tax and franchise taxes utilize the same principles in determining the tax liability based upon the taxpayer's activities within the Commonwealth of Pennsylvania. *See Commonwealth v. ACF Industries,* 441 Pa. 129, 134, 271 A. 2d 273, 276 (1971), and *Commonwealth v. American Telephone and Telegraph Company,* 382 Pa. 509, 514, 115 A. 2d 373, 375 (1955). In the *ACF* case, *supra,* the Court stated: "The only difference is in the nature of the tax measure and the impact of this on the question asked. In the former [franchise tax] the tax is measured by the apportioned value of the capital stock, and the question is whether the business or asset in question contributes or is related to the exercise of the franchise in Pennsylvania. In the latter [corporate net income tax cases] the tax is measured by the apportioned net income, and the question is whether the business or asset in question contributes or is related to the conduct of its income-producing activities here. *Actually, these two questions are the same, the goal being to tax a proportion of value or income reflecting the value of the Pennsylvania franchise."* (Emphasis added.) 441 Pa. at 134, 271 A. 2d at 276.

In the case of *Commonwealth v. Columbia Gas and Electric Corporation,* 336 Pa. 209, 225-26, 8 A. 2d 404, 413-14 (1939), the Court stated:

"In view of the fact that the legislature intended only to levy a tax on a measure fairly representative of the corporation's franchise to do business in this State, under the exceptional situation here presented, it is the

duty of the Court to construe the Act so as to cause the statute's application to be both constitutional and fair. . . .

"[S]ince the tax is nothing but one upon the value of a privilege and the taxable measure is fundamentally the capital stock used in connection with that privilege, we must for the purpose of determining the validity of the tax separate from it that capital stock value which bears no relation to the privilege.

"There may be cases in which a foreign corporation pursues in this State, not merely one (as in the present case), but all the activities in which it engages in the state of its domicile, and nevertheless it may own assets, tangibles or intangibles, in its domiciliary state, which bear no fair relation to the value of the franchise enjoyed by the corporation in this State. In such cases such assets must be excluded from the value of the entire capital stock in determining the measure of the tax."

Carheart relies upon the case of *Commonwealth v. The Mundy Corporation*, 51 Dauph. 195 (1941), affirmed at 346 Pa. 482, 30 A. 2d 878 (1943), which involved a case with similar facts. In the *Mundy* case, the Court held that the value of securities which the Commonwealth was attempting to include in the tax formula base was "not an integral part of the appellee's business conducted in Pennsylvania." The Commonwealth in the case before us countered by pointing out that the *Mundy* case was distinguished by the courts in this State in the case of *Commonwealth v. Eaglis Corporation*, 55 Dauph. 356 (1944) and 56 Dauph. 227, affirmed in part at 354 Pa. 493, 47 A. 2d 661 (1946), where the court pointed out that there is a critical difference where the corporate taxpayer is not authorized to engage in the business represented by its holding of securities in Pennsylvania. In *Eaglis*, the corporate tax-

payer was specifically authorized to carry on such a business, and this difference was utilized by the *Eaglis* court as partial foundation for its holding the taxpayer liable on the tax claim. In this case, Carheart is specifically authorized to deal in the securities of other corporations, as will be noted in the Findings of Fact above, which places it within the *Eaglis* analogy.

The reported cases in this Commonwealth have established the principle that the burden is placed upon the protesting taxpayer to show that the Commonwealth has erred in its computation of the capital stock value used in arriving at the franchise tax liability. In the case of *Commonwealth v. Emhart Corporation,* 443 Pa. 397, 403, 278 A. 2d 916, 918-19 (1971), the Court stated: "[T]he burden is on the taxpayer to show by clear and cogent evidence that the taxing formula resulted in extraterritorial values being taxed." The *Emhart* Court cited, with approval, *Commonwealth v. The Mundy Corporation,* 346 Pa. 482, 484, 30 A. 2d 878, 879 (1943), and the Court stated: "The proper standard to be utilized in evaluating whether a taxpayer has satisfied his burden as to an unrelated asset is to determine if there is clear evidence that the asset is not 'a necessary part of the activity.' " 443 Pa. at 404, 278 A. 2d at 919.

In the case of *Commonwealth v. ACF Industries, Inc., supra,* we find further decisional language to aid us in our analysis of claims for exclusions of value or income, where the court said: "Exclusion of value or income is claimed because the taxpayer either (1) is engaged in a separate business outside of Pennsylvania (the so-called 'multiform' concept) or (2) owns an asset or assets unrelated to the exercise of its franchise or the conduct of its activities in Pennsylvania (the so-called 'unrelated asset' concept)." 441 Pa. at 135, 271 A. 2d at 276.

In applying the applicable law to the Findings of Fact, it seems clear to us, then, that if the Meadville

stock was an integral part of the ongoing business of Carheart in Pennsylvania, then the value of the Meadville stock must be included in the Pennsylvania capital stock value basis from which the franchise tax liability is computed.

Since Carheart's incorporation under the statutes of the State of Delaware in 1933, it has maintained a statutory office and agent in that State. In 1933, Carheart received a certificate of authority to conduct business in Pennsylvania and has since that time maintained a registered business office in the Commonwealth. The dividends from its Meadville stock were received in the Commonwealth during the taxable year and became a part of the general assets of Carheart. These dividends were commingled with the general assets of Carheart. The Meadville stock comprises a sizeable portion of the total Carheart assets. Although Carheart was registered to do business in New Jersey during the taxable year, none of the facts indicates that there was any business activity in New Jersey with regard to the Meadville stock. All correspondence and documents concerning the Meadville stock were sent to, or received in Pennsylvania. Carheart's bank account into which Meadville dividend checks were sent and placed was located in Pennsylvania. The Meadville stock certificates were kept in a safety deposit box located in Pennsylvania. All of the correspondence concerning offers to sell the Meadville stock were directed to the Pennsylvania office. Possibly the most important factual matter, and the most telling aspect of Carheart's dealings with the Meadville stock, is the revelation within the Stipulation of Facts that the dividends paid on the Meadville stock during the taxable year, in the amount of $41,250, were used for the payment of Carheart's expenses. (See Finding of Fact No. 73.)

We note in passing that the Stipulation of Facts provides a credible basis for an evaluation of Meadville

stock higher than the one million dollar valuation used by the Commonwealth in its settlement. The record discloses an offer to purchase Carheart's 27,500 shares of Meadville stock at a price of $60 per share, thus representing an aggregate offer to purchase this stock for $1,650,000.

For reasons undisclosed to this Court, this case has lain dormant for many years, neither of the parties pressing for a determination of the issue. The Commonwealth now urges that the capital stock basis and the resultant fractional formula employed in arriving at the settlement statement issued in 1960 (which gave rise to this appeal) should be altered in light of certain revelations contained in the Stipulation of Facts filed with this Court in 1971. We are not disposed, as of this late date, to alter the capital stock basis and the fractional formula as found by the Department of Revenue and the Auditor General for the franchise tax liability of this taxpayer for the year 1958.

## CONCLUSIONS

1. The tax imposed upon a foreign corporation by the Act of June 1, 1889, P. L. 420, as amended, is a tax upon the franchise, i.e., the privilege of doing business in this Commonwealth, and is measured by the value of the franchise or privilege exercised therein.

2. Carheart, during the year 1958, was authorized to acquire and deal in any manner with the securities of other corporations, together with many other forms of business endeavor, and did in fact transact said business under its entitlements during the taxable year.

3. Carheart properly and legally held and dealt with the shares of the stock of the Meadville Corporation in Pennsylvania during the year 1958.

4. Where a foreign corporation (Carheart) authorized to do business in Pennsylvania, within its corporate authority, holds and maintains physical custody in

this State the securities of another corporation (Meadville), receives in this State the dividends paid on this investment, commingles same with its own funds in this State, permitting such dividend proceeds to be used in meeting the operating expenses of such foreign corporation, and thereby utilizes such investment as an integral part of its ongoing business operation in this State, the value of such securities (the Meadville stock) owned by such foreign corporate taxpayer (Carheart) must be included in the capital stock valuation related to its franchise or privilege of doing business within this State.

5. This Court has jurisdiction to make this determination.

Based upon the above analysis, we

### ORDER

AND Now, this 6th day of April, 1972, the appeal of Carheart Corporation from the decision of the Board of Finance and Revenue is hereby dismissed and the tax settlement approved by the Secretary of Revenue on April 27, 1960, and the Auditor General on April 29, 1960, is hereby approved; and judgment is rendered in favor of the Commonwealth of Pennsylvania in the principal amount of $3,575.33, less credit for payment by Carheart Corporation in the amount of $3,343.74, together with interest at the legal rate on the unpaid debit balance of $231.59, from May 29, 1960 to date of payment.